**UNITED STATES of America,**

v.

**Edwin SANTOS and Daniel Delgado, Defendants.**

**No. 96 Cr. 168(SAS).**

United States District Court, S.D. New York.

April 15, 1997.

Daniel Meyers, New York City, for Santos.

Christine H. Chung, Assistant United States Attorney, New York City, for the Government.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

### I. Introduction

Defendant Edwin Santos ("Santos") moves to suppress evidence seized during an inventory search of his belongings. In my previous opinion in this matter dated February 10, 1997, I addressed defendant Edwin Santos' challenge to the inventory search. After a brief description of the facts and the applicable law, I decided to hold an evidentiary hearing to determine whether this particular inventory search was conducted pursuant to a standardized procedure or established routine. A hearing was held on February 13, 1997.[1] For the reasons set forth below, I now find that the inventory search violated

---

1. The only witness at the hearing was FBI Agent Theresa Meehan, who conducted the inventory.

defendant's Fourth Amendment rights and therefore grant defendant's motion.

## II. Applicable Legal Standards

The Fourth Amendment prohibits unreasonable government searches and seizures. Generally, a search must be conducted pursuant to a warrant to be considered "reasonable" under the Fourth Amendment.[2] However, police may conduct a warrantless "inventory search" of property that comes lawfully into their possession in order to protect that property while it is in police custody, to protect the police from claims over lost or stolen property, and to protect the police from potential danger.[3] Although often inventory searches involve the search of an arrestee's automobile, the inventory search exception extends to property found on an arrested person who is to be jailed. *See Illinois v. Lafayette*, 462 U.S. 640, 646, 103 S.Ct. 2605, 2609, 77 L.Ed.2d 65 (1983) ("Examining all the items removed from the arrestee's person or possession and listing or inventorying them is an entirely reasonable administrative procedure").

■ While there is no need for the government to have probable cause before conducting an inventory search, protections against arbitrary exercises of police power are afforded by the requirement that inventory searches be conducted pursuant to a standardized or routine practice.[4] Thus, if permitted by applicable procedures, an officer may search containers or examine written material in the course of an inventory search. *See United States v. Griffiths*, 47 F.3d 74, 78 (2d Cir.1995); *Arango–Correa*, 851 F.2d at 59 (permissible for agents to open notebooks in course of inventory search of forfeited vehicle). Even the fact that the officer may harbor an investigatory motive does not invalidate an otherwise appropriate inventory search. *See United States v. Rodriguez–Morales*, 929 F.2d 780, 787 (1st Cir. 1991), *cert. denied*, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992); *United States v. Gallo*, 927 F.2d 815, 819 (5th Cir.1991); *United States v. Frank*, 864 F.2d 992, 1003 (3d Cir.1988), *cert. denied*, 490 U.S. 1095, 109 S.Ct. 2442, 104 L.Ed.2d 998 (1989); *United States v. Edwin Palacios and Jason Palacios*, 957 F.Supp. 50, 53–54 (S.D.N.Y.1997).

■ On the other hand, "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990). It is for that reason that standardized criteria or an established routine must regulate an inventory search and in particular the search of "closed" items during such a search. The purpose of an inventory search should be to produce an inventory. A police officer should not be allowed so much discretion that inventory searches become "a purposeful and general means of discovering evidence of a crime." *Colorado v. Bertine*, 479 U.S. 367, 376, 107 S.Ct. 738, 743, 93 L.Ed.2d 739 (1987) (Blackmun, J., concurring). Thus, the government may not conduct a search of an arrestee's property to discover inculpatory evidence under the guise of an inventory search. *See, e.g., United States v. Khoury*, 901 F.2d 948, 958–59 (11th Cir.1990); *United States v. Prescott*, 599 F.2d 103, 105 (5th Cir.1979); *Palacios*, 957 F.Supp. at 54.

---

2. *But see California v. Acevedo*, 500 U.S. 565, 582, 111 S.Ct. 1982, 1992, 114 L.Ed.2d 619 (1991) (Scalia, J., concurring) ("[e]ven before today's decision, the 'warrant requirement' had become so riddled with exceptions that it was basically unrecognizable" and noting twenty-two exceptions to the warrant requirement).

3. *See Whren v. United States*, —— U.S. ——, —— n. 1, 116 S.Ct. 1769, 1773 n. 1, 135 L.Ed.2d 89 (1996). These "caretaking" purposes provide the rationale for excepting inventory searches from the warrant requirement because they distinguish inventory searches from those designed to uncover evidence of criminal activity. "In view of the *noncriminal* context of inventory searches ... courts have held—and quite correctly—that search warrants are not required.... With respect to *noninvestigative* police inventories of automobiles ... the policies underlying the warrant, requirements ... are inapplicable." *South Dakota v. Opperman*, 428 U.S. 364, 371 n. 5, 96 S.Ct. 3092, 3098 n. 5, 49 L.Ed.2d 1000 (1976) (emphasis added).

4. Such routine procedures need not be in writing. Unwritten routine office practices suffice to meet the requirement of standardized procedures. *See United States v. Thompson*, 29 F.3d 62, 65–66 (2d Cir.1994); *United States v. Arango–Correa*, 851 F.2d 54, 59 (2d Cir.1988).

## III. Factual Background

As noted in the previous opinion, there is no question that Santos was lawfully arrested at a state prison by federal officers pursuant to pending federal charges. At the time the defendant was transferred to federal custody his belongings, contained in three duffel bags, were given to the arresting officer. Several days later, the arresting officer conducted a detailed inventory search.[5]

At the February 13 hearing, Agent Meehan testified that the FBI legal handbook has a general written policy with respect to inventory searches. Section 5–3.8 of the Legal Handbook for Special Agents, titled "Inventory of Personal Property" is brief. It reads in full:

Items of personal property removed from a person who has been arrested and is to be incarcerated should be carefully inventoried by Agents prior to being stored for safekeeping. A receipt for such property should be prepared and given to the arrestee. This inventory should include the contents of containers such as purses, shoulder bags, suitcases, etc., whether or not the containers are locked or sealed. In the event such containers are locked or sealed great care must be taken to minimize damage to the container or its contents while gaining access. This caretaking function must not be construed as an alternative to a search warrant whenever there is probable cause to believe that evidence of contraband is inside a container. Under those circumstances the container should be secured until a search warrant can be obtained.

Government Exhibit ("GX") 2 to February 13, 1997 Hearing. Agent Meehan, however, seemed unsure of the content of this policy. See Hearing Transcript ("Tr") at 9. Rather, she testified that she conducted this inventory search in conformity with procedures she had been taught to follow during her training. Id. at 10. Specifically, Agent Meehan testified that "you look at and describe every item that is in the property that you are taking, and then in some way denote where each item is going if they are being separated." Id. When asked why this is done, Agent Meehan responded:

For several reasons: One, that there is no misunderstanding about what we received so that no one has questions down the line about something being added to the property or taken from the property; also, because different kinds of property are stored in different places at the FBI. Valuables go in one direction, guns go in a different direction, and drugs are kept in a separate vault. And, so you have to itemize everything. For safety reasons you have to know if you are dealing with anything explosive or otherwise hazardous. And, eventually, what you take is going to be returned to someone outside of the FBI; and, if it is evidence in a case or contraband, it doesn't get returned, so you have to know what you are dealing with before you return it.

Id. at 11–12.

## IV. Discussion

### A. The Inventory Search Was Pretextual

A threshold question, then, is whether this inventory search was conducted in accordance with the policy articulated in the FBI Handbook and by Agent Meehan. In my view, it was not. Agent Meehan testified that she "opened each bag, took out each item and wrote down a description of the item." She "then separated out anything that I thought would be evidence and would need to be retained...." Id. at 8. On cross examination, Agent Meehan was asked: "Is it not fair to say that you were looking while you were going through his personal property for anything that might relate to the Latin Kings?" Her answer was "Yes". Id. at 22.

5. The government argues that defendant has no standing to pursue a Fourth Amendment challenge to the inventory search simply because he was incarcerated at the time the FBI came into custody of his belongings. See Government's Memorandum in Opposition to Defendant's Pretrial Motions ("Gov't Memo.") at 18. This argument fails in light of the established law of this Circuit. See, e.g., United States v. Cohen, 796 F.2d 20, 24 (2d Cir.) (prisoner retained sufficient expectation of privacy within his cell to challenge search ordered by the prosecutor for investigatory rather than institutional security related reasons), cert. denied, 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986).

Agent Meehan also conceded that it took her seven days (from October 12 to October 19) to complete the inventory of the three duffel bags. *Id.* at 23. When asked whether it could have been completed in an hour or two for the purpose of an inventory, Agent Meehan responded: "I would say several hours. It takes several hours to write down a description of every single thing that you pull out of three large bags." *Id.* at 24.

A review of the six-paged single spaced inventory list is instructive. *See* GX 1. This list reveals that every piece of written material was painstakingly reviewed and described. Each page of books or calendars was read or reviewed and any information relevant to the investigation was noted on the inventory list. A few examples might be helpful: (1) "Two small brown New Testaments—one blank; one marked 'KING OF KINGS; ED! A.L.K.N.; BAY RIDGE', marked throughout with names, addresses and telephone numbers"; (2) "one article, 'The Inmate Gangs of Riker's Island' with notation 'That's Me' next to story of assault on C.O."; (3) "one paperback book, *The Chamber*, marked 'DIABLO IZM' and 'SANTOS' and inscribed 'TO DA DON FIC; I LOVE YOU NIGGA. THIS LOVE IS REAL KID. HOLD YO' HEAD. BROOKLYN STALLIONS. E.S.P. TO DA FULLEST ... STAY AWAY FROM THE PENKOS. YOUR REAL BROTHER! DIABLO IZM ...'".

What is equally informative is a comparison between the list of all the inventory items (GX 1) and the list of items which were returned to the defendant (DX A—items stricken with a magic marker were not returned). The vast majority of items were retained as evidence. Finally, when asked to describe items that she considered to be of evidentiary value, Agent Meehan gave the following answer:

They don't have to necessarily speak about the Latin Kings to be of evidentiary value. They can be from someone we know to be a Latin King. They can be from someone who has come up previously in the investigation. And if they contain an address

where we can find them and talk to them, that becomes evidence in our investigation. Tr. at 31.

■ Based on this record, it is apparent that Agent Meehan was not conducting a routine inventory search. The purpose of her inventory was not the "caretaking" function addressed in the cases. Rather, the inventory provided a pretext for a full and detailed search of all of the defendant's belongings for the explicit purpose of uncovering evidence and thus violated defendant's rights under the Fourth Amendment.

B.  Agent Meehan Should Not Have Read Defendant's Books and Letters

Even if Agent Meehan did not use the inventory search as a subterfuge for a warrantless investigation of defendant's possessions, she failed to limit her examination to the boundaries permitted by applicable case law. The underlying justifications of the inventory search exception make clear that the objective of caretaking, not investigation, must guide the inventory process. Yet as stated above, Agent Meehan's actions went far beyond that which is necessary to inventory defendant's personal items.

■ The distinguishing feature of Agent Meehan's search was that she read all the written material that she found among defendant's possessions. She did so not because her eye happened to fall upon clearly printed words on the face of inventoried items, or because she was attempting to determine the nature of an object to be inventoried. Rather it is apparent that Agent Meehan read defendant's books and letters in order to discover incriminating evidence. This affirmative, investigatory act overstepped the limits of the inventory search exception permitted by current Fourth Amendment case law. *See Khoury,* 901 F.2d at 958–59 ("An inventory search is not a surrogate for investigation, and the scope of an inventory search may not exceed that necessary to accomplish the ends of the inventory."); *Prescott,* 599 F.2d at 105; *Palacios,* 957 F.Supp. at 54; *People v. Sommerville,* 170 Misc.2d 1024, 652 N.Y.S.2d 931, 934 (Sup.Ct. Kings Co.1996) ("while a police officer's leafing through the individual pages in a weekly appointment

calendar book may further one or more of the governmental interests sought to be protected in the context of an inventory search, the reading of the entries therein furthers no such purpose.").

This holding allows officers to examine written material during an inventory search to determine if hidden objects lie within the pages, *see Arango–Correa,* 851 F.2d at 59, yet bars the same officers from deliberately reading what is written on those pages without first obtaining a warrant. This may create the kind of fine legal distinction that, while sound in theory, may in practice resist faithful application. However, limits must be placed on the inventory search exception if it is not to eviscerate the warrant requirement and become "another talisman to overcome the requirements of the Fourth Amendment". *Bertine,* 479 U.S. at 387, 107 S.Ct. at 749 (Marshall, J., dissenting).[6] As there is no reason why government officials must read written material in order to inventory an arrestee's personal belongings, the Fourth Amendment requires that they must obtain a warrant before doing so. I do not believe that the difference between flipping through written material to determine whether items are hidden between pages and reading that material in an attempt to discover inculpatory evidence is such a "fine and subtle" distinction as to hinder the government's future inventory efforts. Such a rule, however, does effectively protect an arrestee's privacy interest in barring the government from searching written materials without first obtaining a warrant based on a showing of probable cause.

## V. Conclusion

For the reasons explained above, I find that Agent Meehan's search of defendant's property was not properly conducted pursuant to an established routine or procedure, but rather was conducted for the purpose of finding evidence of criminal activity. Furthermore, the written materials found in defendant's property should not have been read as Agent Meehan was not required to do so in order to properly conduct an inventory search. Because this search violated the Fourth Amendment, defendant's motion to suppress is granted.

---

6. *See also* Jason S. Marks, *Taking Stock of the Inventory Search: Has the Exception Swallowed the Rule?,* 10–Spg. Crim. Just. 11, 53 (1995) ("The inventory search has evolved into the police officer's 'golden parachute' —— when not armed with exigencies or probable cause, only bare suspicions, a skilled police officer can turn a routine traffic stop into a full-scale investigatory search.").