729 A.2d 55 (1999)
321 N.J. Super. 365
The STATE of New Jersey, Plaintiff,
v.
Reggie JACKSON aka "Sincere", Defendant.
Superior Court of New Jersey, Law Division, Passaic County.
Decided February 3, 1999.
Supplemented by Written Opinion April 6, 1999.
*56 Ronald S. Fava, Passaic County Prosecutor, for plaintiff (Kevin D. Wronko, Senior Assistant Prosecutor appearing).
Thomas C. Kaiser, Passaic, for defendant.
DE LUCCIA, J.S.C.
While being detained pending trial on an indictment for murder and other related charges, defendant's dormitory area at the Passaic County Jail, including his bed, was subjected to a pretextual search by sheriff's corrections officers, at the specific request of the prosecutor, who sought to recover incriminating evidence, including letters and writings believed to be in defendant's possession. Defendant claims the seizure of these materials without the benefit of a search warrant, violates the Fourth Amendment. This court agrees and holds that a cell search of a pretrial detainee implicates Fourth Amendment protections against unreasonable searches and seizures. Accordingly, the evidence seized by the jail authorities without the benefit of a warrant will be suppressed.
On July 15, 1996, two armed men, their identities concealed, appeared in front of 7 Graham Avenue, Paterson. They began firing their weapons as they approached a group of individuals congregating on the porch and in front of the building at 7 Graham Avenue. After the fusillade ended, *57 a fifteen year old boy who happened to be seated on his bicycle in front of the building was fatally wounded. Four other victims sustained gunshot wounds of varying degrees and severity. Kevin Jackson, one of the more seriously injured victims, was still conscious at the time the police arrived on the scene. He informed the initial responding officer that he knew the shooters' identities. He named the defendant and his co-defendant, Emir Outlaw, as his assailants. Based upon this information, as well as other leads developed during the course of the subsequent investigation, arrest warrants were prepared charging defendants Jackson and Outlaw with murder and other crimes arising out of the shootings.
Defendant was arrested on July 17, 1996. Jackson was interrogated by the police; however, he denied any involvement in the Graham Avenue shootings. He did provide information in the nature of an alibi. Jackson implicated his girlfriend, Michelle Champion, in an alibi as to his whereabouts at the time of the shootings. As a consequence of the information obtained during the interrogation of Jackson, the police interviewed Champion and other individuals referenced in defendant's statement.
The police interviews of Champion and the others were inconclusive in respect of corroboration of defendant's alibi. Subsequent interviews of Champion failed to resolve the discrepancies. Ultimately Champion declined further interviews on the advice of counsel.
On July 18, 1996, the police arrested the co-defendant Emir Outlaw. During his interrogation, Outlaw provided the police with a written statement admitting his involvement in the shootings and naming Jackson as his accomplice. Thereafter, Jackson and Outlaw were indicted for murder, conspiracy, attempted murder, and various weapons and assault charges. Defendant Jackson was remanded to the Passaic County Jail in lieu of bail to await his trial.
On October 10, 1996, William J. Purdy, Jr., a chief assistant prosecutor in charge of the Homicide Investigation Unit in the Passaic County Prosecutor's Office, received an anonymous telephone call at his office. According to Purdy, an unidentified male caller offered information regarding the investigation of Jackson and Outlaw. The informant related that Jackson was going to attempt to assert an alibi defense. He also claimed that Jackson was calling Champion from the jail and that the two planned to concoct an alibi placing Jackson with Champion either in her car or at some other location at the time of the shootings. The informant revealed that Champion was writing letters to Jackson at the Passaic County Jail. He claimed that these letters dealt with the fictitious alibi. The informant told Purdy that he received his information from a person recently incarcerated at the jail with Jackson.
On October 16, 1996, Purdy received a second telephone call from the same anonymous informant. According to Purdy, the informant stated that Champion was sending letters to Jackson and that the return addresses may be fictitious. He informed Purdy that Champion may be using the pseudonyms, "J. Livingston" and/or "L. Richardson." According to the informant, the purported alibi had been refined to place Jackson with Champion at the time of the shootings. The informant also provided Purdy with information relating to Champion's employer and work schedule. The informant reiterated that his source was a person previously detained with the defendant.
On October 22, 1996, Purdy received a third telephone call from the informant. However, no additional information concerning Jackson's alibi was provided.
On October 23, 1996, Purdy received a fourth telephone call from the same person. The informant claimed that Jackson would receive a letter from Champion either that day or the next. He stated the *58 letter may bear the nickname "Cream" in the return address area and suggested two alternative return addresses which would likely appear on the envelope. After this call, Purdy decided to attempt to corroborate this information. He instructed Prosecutor's Investigator Peter Talarico to contact the authorities at the jail and request that they monitor Jackson's incoming mail to determine points of origin or return addresses.
On November 24, 1996, Talarico received from the jail authorities copies of several envelopes containing correspondence mailed to Jackson at the jail, including four envelopes bearing one of the two return addresses provided by the informant. One of the envelopes was postmarked October 23, 1996, and the other October 24, 1996. This information corroborated the information provided by the anonymous informant.
Convinced that Jackson, Champion and perhaps others were plotting an obstruction of justice, and armed with corroborated information from the anonymous informant, Purdy decided to seek a search warrant to seize any incriminating evidence that Jackson may have concealed at the jail. The warrant sought to authorize a search of the defendant's bunk area in the dormitory known as "4G2" and to seize any letters or correspondence bearing certain return addresses and/or letters or correspondence from Champion, J. Livingston or L. Richardson or any letters or correspondence pertaining or relating to an alibi for Jackson.
The search warrant and supporting affidavit were presented to another judge in the criminal division. However, that judge declined to execute the warrant. Purdy testified that the judge opined that he did not believe a search warrant was required in order to search and seize defendant's property at the jail. Purdy testified that he never encountered a similar circumstance in his fourteen years of experience as an assistant prosecutor. Although he believed a search warrant was required, when the judge declined to authorize the warrant, Purdy determined to conduct a warrantless search of defendant's dormitory area. No effort was made to submit the search warrant application to the presiding judge or to resubmit the application to the original judge with supporting legal authorities.
Purdy testified that it was an essential objective of the prosecutor's office that Jackson remain unaware of the search. Accordingly, representatives of the prosecutor's office contacted Sgt. Anthony Manzo of the Passaic County Sheriff's Department to arrange for a search. Manzo was the supervising officer of the dormitory where defendant was detained.
Manzo testified that defendant was housed in an area known as 4G2 at the Passaic County Jail. The subject area is on the fourth floor of the jail and consists of a large dormitory room housing approximately fifty-five to sixty bunk beds. Detainees in this area of the jail are not confined in individual cells. Manzo stated that the jail authorities "routinely" conduct general searches of the jail, including area 4G2, approximately once a month. These searches are performed for security reasons to uncover contraband, such as drugs, alcohol, weapons and unauthorized reading material, which may have been secreted into the jail. Prisoners and detainees are relocated to other areas during a search.
Manzo testified that it was decided to use a "routine" general search of the entire dormitory area as a subterfuge so as not to alert defendant as to the corrections officers' true objectives. Manzo also testified that he was assigned the task of searching the defendant's dormitory area. The prosecutor's office identified the specific items which they wished to be recovered. Manzo testified that he retrieved various items from defendant's bunk area, including the letters and personal notes now subject of this motion. All the documents were photocopied. The originals were replaced where they were initially *59 found, beneath the mattress on the bed where defendant slept. Manzo emphasized that this was done so as not to alert Jackson as to the discovery or retention of these materials.
One of the items seized was a document purportedly in some type of code. The document appears to be a narrative of defendant's activities before and after the shootings of July 15, 1996. Consistent with the prosecutor's information, it appeared to be exculpatory in respect of establishing some degree of alibi. Although Manzo testified that encoded documents are prohibited in the jail for "security reasons," this document was not seized; rather it was copied.
The items seized from defendant which the State seeks to introduce into evidence do not include any correspondence from Champion or any other person. At best they may be described as notes or writings of the defendant, although exact authorship has not been conclusively established. To the extent that any of the writings may be deemed a letter, the intended recipients are unknown since none of the documents bear any names, including those mentioned by the informant.
The State claims that the search of the dormitory area, including defendant's bunk area, passes constitutional muster. The State argues that as a prisoner, defendant does not enjoy any Fourth Amendment protections respecting any area assigned to him inside a detention facility. Support for the State's position may be inferred from the Supreme Court's decision in Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).
In Hudson, a convicted inmate serving a sentence at a Virginia state penitentiary, filed a civil rights law suit against a prison official under 42 U.S.C. § 1983, claiming that a "shakedown" search of his prison locker and cell by prison guards violated his Fourth Amendment protections. In ruling that the actions of the Virginia authorities did not violate the prisoner's Fourth Amendment rights, the Supreme Court held that the "Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. The recognition of privacy rights for convicted prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." Id. at 468 U.S. at 526, 104 S.Ct. 3194. The Court found that since prisons are repositories for persons with a proclivity for anti-social behavior which is often violent, society's interests in the security of its correctional institutions outweigh the interests of a prisoner in the privacy of his cell. Id. at 468 U.S. at 526-528, 104 S.Ct. 3194.
The Court's rationale is premised upon the fact that weapons, drugs and other contraband present a serious danger to institutional order within the prison environment. They are an accelerant which, if introduced into the incendiary penal environment, would make the extraordinary difficult undertaking of prison administration a virtual impossibility. Id. at 468 U.S. at 527, 104 S.Ct. 3194. The Court concluded that "we are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security. We believe that it is accepted by our society that `[l]oss of freedom of choice and privacy are inherent incidents of confinement'. Bell v. Wolfish, 441 U.S. 520, 537, 99 S.Ct. 1861, 1873, 60 L.Ed.2d 447 (1979)." Id. at 468 U.S. at 528, 104 S.Ct. 3194.
Prior to Hudson, the Supreme Court had occasion to consider Fourth Amendment rights in respect of pretrial detainees. In Bell v. Wolfish, supra, pretrial detainees housed at the Metropolitan Correctional Center (MCC), a federally operated short term custodial facility in New York designed primarily to house pretrial detainees, filed suit to prevent unannounced "shakedown" searches of inmates' living areas. During these shakedowns, *60 MCC officials cleared all inmates from the residential units while guards searched each room. The inmates were not permitted to watch the search. In reversing the lower courts, the Court found that "given the realities of institutional confinement, any reasonable expectation of privacy that a detainee retained necessarily would be of a diminished scope." (Citations omitted). Id. at 441 U.S. at 557, 99 S.Ct. 1861. The Court, however, declined to decide definitively whether a pretrial detainee retains even a diminished expectation of privacy after commitment to a custodial facility. However, the Court found that the shakedown searches conducted by MCC guards for the purposes of discovering contraband, did not violate the Fourth Amendment. Ibid.
The Court also ruled constitutional the practice of the authorities at the MCC to conduct visual body cavity inspections as part of strip searches performed after every contact visit with a person from outside the institution. While acknowledging some difficulty with the concept, the Court concluded that visual non-invasive body cavity searches of detainees, both male and female, did not violate Fourth Amendment rights. In reaching its conclusion, the Court did not find that the pretrial detainees had been stripped of all Fourth Amendment rights, but rather that under the circumstances, the searches met the reasonableness test of the Fourth Amendment. The Court was satisfied that a detention facility "is a unique place fraught with serious security dangers." Id. at 441 U.S. at 559, 99 S.Ct. 1861. Accordingly, the commonplace efforts of inmates and others to smuggle in weapons and other contraband and often secreting them in body cavities, justified the visual body cavities searches employed at the MCC. Ibid.
Prior to the Supreme Court's decision in Hudson v. Palmer, supra, decisions in the federal system upholding inmates' cell searches were reached only in cases where the search was premised on institutional security considerations. See Brown v. Hilton, 492 F.Supp. 771, 777 (D.N.J.1980). See also United States v. Ready, 574 F.2d 1009, 1014 (10th Cir.1978). See Bonner v. Coughlin, 517 F.2d 1311, 1317 (7th Cir. 1975), rev'd on other grounds 545 F.2d 565, 569 (7th Cir.1976).
Since its decision in Hudson, the Supreme Court has yet to resolve whether pretrial detainees retain any Fourth Amendment rights. This court's research fails to disclose any reported decision in New Jersey on this issue. However, the issue has been considered by appellate courts in several federal circuits as well as appellate courts in other state jurisdictions. Not surprisingly, the results are not uniform.
In People v. Phillips, 219 Mich.App. 159, 555 N.W.2d 742 (1996), the Michigan Court of Appeals extended the rationale adopted by the Supreme Court in Hudson to pretrial detainees. The Michigan court, by implication, concluded that pretrial detainees do not retain any reasonable expectation of privacy within a jail cell and therefore are subject to searches and seizures without consideration of Fourth Amendment protections. Id. at 743-744.
The difficulty with the opinion of the Michigan Court of Appeals is that there is a paucity of facts. The exact circumstances of the search of the defendant's cell are not disclosed in the opinion. However, the court implied that the warrantless search was conducted out of prison security concerns. Ibid.
The North Carolina Supreme Court reached a similar conclusion in State v. Martin, 322 N.C. 229, 367 S.E.2d 618 (1988). In Martin, jail authorities seized an incriminating letter written by a defendant during the course of a search of his cell. At the time of the search, the defendant was detained pending trial. The letter had been placed in a notebook by the defendant and was uncovered by a jailor while perusing the notebook after its discovery during the search. The North Carolina Supreme Court held that the warrantless *61 search did not violate the Fourth Amendment since the defendant, although a pretrial detainee, enjoyed no expectation of privacy in his jail cell. Id. at 621-622. As in People v. Phillips, supra, the North Carolina Court provided no facts illuminating the background of the search of defendant's cell. However, it may be inferred from the opinion that the search was also related to jail security. Id. at 621.
A different view of Fourth Amendment protections as applied to pretrial detainees was reached in United States v. Cohen, 796 F.2d 20 (2d Cir.1986), cert, denied, 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986), and 479 U.S. 1055, 107 S.Ct. 932, 93 L.Ed.2d 982 (1987). The facts are that Barr, a co-defendant, was remanded to the New York Metropolitan Correction Center (MCC) in lieu of bail pending trial. While detained, an MCC corrections officer conducted a "contraband search" of the detainee's cell. The search consisted entirely of an examination of Barr's papers. After completing the initial search, the MCC officer returned to the cell and examined additional papers of the defendant. The searches, however, were not instituted by officials at the MCC for security purposes. They were initiated at the direction of an assistant United States attorney who was seeking specific incriminating evidence relating to the defendant, his co-conspirators and witnesses the defendant had contacted or was attempting to contact.
As a result of the pretextual search of defendant's cell, the government applied for and obtained a search warrant to conduct a more expansive search of defendant's cell. The probable cause for the issuance of the warrant was the information obtained in the warrantless search of defendant's papers. The district court suppressed some materials on Sixth Amendment grounds but declined to deem the search in violation of the Fourth Amendment. The Court of Appeals disagreed and reversed.
The Second Circuit analyzed federal decisional law regarding constitutional protections afforded to prisoners and pretrial detainees. It traced the history of significant rulings, including the pronouncements of the United States Supreme Court in Bell v. Wolfish, supra, and Hudson v. Palmer, supra. The Second Circuit concluded that the Supreme Court's decision in Hudson "did not contemplate a cell search intended solely to bolster the prosecution's case against a pretrial detainee awaiting his day in court." Id. at 23. The court refused to expand the holdings of the Supreme Court to completely deny all Fourth Amendment protections to a pretrial detainee regardless of the circumstances underlying the search. Ibid. The Second Circuit held "[t]he door on prisoners' rights against unreasonable searches has not been slammed shut and locked. We take seriously the Court's statement that no iron curtain separates prisoners from the Constitution, and that the loss of such rights is occasioned only by the legitimate needs of institutional security." Ibid.
The court observed that no institutional security need was served by the search. Ironically, had the MCC official initiated the search independent of prosecutorial instigation, it would have been deemed valid irrespective of justification on security grounds. Ibid. However, since the government initiated the search solely to obtain information for a superseding indictment, the Second Circuit concluded that the warrantless search of defendant's cell was precluded by the Fourth Amendment. Ibid.
In United States v. Santos, 961 F.Supp. 71 (S.D.N.Y.1997) the district court ruled invalid a pretextual inventory search of defendant's property conducted by the Federal Bureau of Investigation. Defendant, an inmate at a state prison, had been lawfully arrested by federal officers on pending federal charges. At the time the defendant was transferred to federal custody, his belongings, contained in three duffel bags, were delivered to the arresting officer. The officer, an FBI agent, conducted a detailed inventory search several *62 days after the federal arrest of the defendant.
The district court decided that the FBI agent had exceeded the scope of a legitimate inventory search. The court found that the agent did not conduct the inventory search as a caretaking function but rather used it as a pretext for full and detailed search of defendant's belongings for the explicit purpose of uncovering evidence. Id. at 74. Since the FBI agent's search was a veiled attempt to read the defendant's books and letters in order to uncover incriminating evidence, the court ruled the search in violation of the Fourth Amendment and suppressed the evidence. Ibid. The court specifically rejected the argument that defendant lacked standing to raise a Fourth Amendment challenge to the inventory search inasmuch as he was incarcerated at the time the FBI came into custody of his papers. In finding that the defendant retained a sufficient expectation of privacy, the court relied upon United States v. Cohen, supra. Id. at 73 n. 5.
However, in United States v. Reece, 797 F.Supp. 843 (D.Colo.1992), the district court declined to suppress evidence seized from the defendant during a search initiated by the Internal Revenue Service while defendant was incarcerated pending trial on federal charges. Concededly, the search was neither routine nor related to prison security but rather an effort by the Internal Revenue Service to obtain incriminating information in relation to the pending indictment. In moving to suppress the evidence, Reese relied upon United States v. Cohen, supra. The district court disagreed and distinguished the Second Circuit's opinion in United States v. Cohen, supra. The court found that although Reese was pending trial on federal charges, he was already serving a sentence for a state conviction when his cell was searched by prison authorities at the request of the IRS. Therefore, Reese was not considered a pretrial detainee and accordingly retained no expectation of privacy and Fourth Amendment protections. Id. at 846.
In McCoy v. State, 639 So.2d 163 (1994), the Florida District Court of Appeals reversed a trial court's denial of defendant's motion to suppress certain documents which were seized by the police while he was detained pending trial. The search and seizure of the defendant's materials, including deposition transcripts, reports, personal notes as well as a letter, were conducted while defendant was incarcerated at a pretrial detention facility. On the eve of the scheduled trial, the prosecutor assigned to the case and a police officer acting at the prosecutor's direction, visited the defendant's cell at the detention facility. After removing the defendant and a cellmate, the officer, acting at the expressed instructions of the prosecutor, searched the cell seeking specific and potentially incriminating writings authored by defendant. The prosecutor oversaw the search.
At the suppression motion, the prosecutor conceded that he authorized the search and that it was unrelated to any security concern at the facility. According to the prosecutor, the search had been motivated exclusively by the expectation of locating incriminating statements against the defendant. Id. at 163-164. The Florida court concluded that the Supreme Court's decisions in Hudson v. Palmer, supra, and Bell v. Wolfish, supra, did not foreclose Fourth Amendment protections to pretrial detainees who were subjected to searches and seizures which are not initiated by institutional personnel and are not even "colorably motivated by concerns about institutional security." Id. at 165. The court decided to follow the "persuasive reasoning in United States v. Cohen,(supra)." Ibid.
In Lowe v. State, 203 Ga.App. 277, 416 S.E.2d 750 (1992), the Georgia Court of Appeals held that a search of a pretrial detainee's prison cell and seizure of papers, documents and other materials containing the handwriting of the defendant, *63 invoked the protections of the Fourth Amendment and required a warrant since the search was pretextual and was conducted at the instigation of the prosecutor in an effort to bolster the state's case against the defendant. Id. at 278, 416 S.E.2d 750. The court specifically held that "[w]e will not apply the rationale of Hudson to deprive defendant of all Fourth Amendment protections where no institutional need is served by the search." Id. at 278-279, 416 S.E.2d 750. The court concurred in the holding in United States v. Cohen, supra, and other cases which adopted the rationale of the Second Circuit. Ibid.
In State v. Neely, 236 Neb. 527, 462 N.W.2d 105 (1990), the Nebraska Supreme Court determined that a pretrial detainee incarcerated at a county jail awaiting trial retained a legitimate expectation of privacy in luggage removed from her impounded automobile and stored in the jail's locked inventory. The Nebraska Supreme Court declined to extend the Supreme Court's ruling in Hudson v. Palmer, supra, to pretrial detainees. Id. at 111-112. See also People v. Hardy, 2 Cal. 4th 86, 5 Cal.Rptr.2d 796, 825 P.2d 781, 837 (1992).
This court finds the rationale adopted by the Second Circuit in United States v. Cohen, supra, and those cases which follow, persuasive. Jackson has been detained at the Passaic County Jail solely because of his inability to post bail. He has been indicted but not yet convicted. At this juncture, he is cloaked with the presumption of innocence. While that cloak may not shield him or his property from the prying eyes of his jailors in their efforts to maintain institutional security, it will insulate him from surreptitious attempts of the prosecutor to obtain evidence without the benefit of a warrant. Defendant's expectations of privacy may be greatly diminished, but they are not completely extinguished. This remains true even though arguably any expectation of privacy would be less in a dormitory type setting than in an individual cell. This court is persuaded that a pretrial detainee's Fourth Amendment protections cannot be eradicated simply because correctional authorities choose to house detainees in large dormitory rooms as opposed to smaller cells.
The facts in this case are unequivocal. The search of Jackson's dormitory area, including his bed, was not remotely connected to any institutional security concerns. The search was a pretext designed to permit the prosecutor to invade defendant's limited zone of privacy in order to bolster its case against the defendant. If any of the materials uncovered during the course of this search had actually violated jail regulations, they would have been seized. However, none were.
The pretextual search and seizure of defendant's property at the jail is also deemed impermissible under article I, paragraph 7, of our State Constitution, the counterpart to the Fourth Amendment of the United States Constitution. Our Supreme Court has a long and respected tradition of affording the citizens of our State greater protections against unreasonable searches and seizures under our State Constitution than are otherwise available under the federal constitution. State v. Novernbrino, 105 N.J. 95, 145, 519 A.2d 820 (1987). In Novernbrino, the Court rejected under our State Constitution the federal "good faith" exception to the exclusionary rule for search warrants issued in good faith but without probable cause. Id., at 159, 519 A.2d 820. See also State v. Hunt, 91 N.J. 338, 450 A.2d 952 (1982) (New Jersey State Constitution affords protectable interests in telephone toll billing records); State v. Alston, 88 N.J. 211, 440 A.2d 1311 (1981) (recognizing under New Jersey State Constitution a possessory interest in property as sufficient to convert standing to challenge the validity of automobile search); State v. Johnson, 68 N.J. 349, 346 A.2d 66 (1975) (holding under New Jersey State Constitution that the validity of a consent to search depends on knowledge of a right to refuse consent); *64 State v. Pierce, 136 N.J. 184, 208, 642 A.2d 947 (1994) (holding that in respect of a warrantless search of a vehicle incident to a warrantless arrest, the New Jersey State Constitution affords greater protection against unreasonable searches and seizures than the Fourth Amendment of the federal constitution) and State v. Tucker, 136 N.J. 158, 165, 642 A.2d 401 (declining to follow United States Supreme Court decision that a seizure of a person under the Fourth Amendment requires application of physical force or show of authority to which suspect yields).
The State also argues that the unsuccessful effort to obtain a search warrant constitutes sufficient reason to exempt this search from the warrant requirements. The State reasons that if a judge rejects a warrant application under a mistaken belief that one is not required, then it may conduct the warrantless search in "good faith." There are several reasons why this court finds the argument to be unpersuasive.
It must be remembered that a warrantless search is presumed to be invalid. The burden is upon the State to prove the overall reasonableness and validity of the search. The State must then demonstrate that the failure to obtain a warrant was justified, that is, the search falls within one of the recognized exceptions to the warrant requirement. See State v. Patino, 83 N.J. 1, 7, 414 A.2d 1327 (1980).
The State offered no evidence other than Purdy's hearsay statements to establish that the search warrant application was denied because the judge deemed it superfluous. The judge was not invited to testify concerning his recollection of the application and the opinions he may have expressed concerning its necessity. The warrant introduced at the hearing bore only a notation "application not executed."
Another flaw in the State's position is that it seems to suggest the existence of a "good faith" exception for a warrantless search. However, our Supreme Court in State v. Novembrino, 105 N.J. supra, at 159, 519 A.2d 820, specifically rejected the "good faith" exception to the requirement of obtaining a valid warrant, declining to follow United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) and Massachusetts v. Sheppard, 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). If there exists no "good faith" exception for defective warrants authorized by a neutral magistrate, then surely it follows that there is no exception for warrants which a judge declines to execute.
This court has serious doubts as to the sufficiency of the application for the warrant. The affidavit is predicated upon information provided by an anonymous informant whose reliability and veracity had not been previously substantiated by the prosecutor. In such cases, there must be within the totality of the proofs submitted to the issuing judge, "something from which he can reasonably conclude that the informant is trustworthy and something further in the way of `underlying circumstances' sufficient to support an independent judgment on his part as to the validity of the facts set forth." State v. Ebron, 61 N.J. 207, 212, 294 A.2d 1 (1972).
Here, the State sought to establish the reliability of this anonymous informant by corroborating certain information about mail defendant was expected to receive from his girlfriend. However, that corroborating information was also obtained by the State without the benefit of a search warrant. While it is true that the jail authorities could have opened and examined incoming mail addressed to the defendant for security purposes, that procedure was not followed in respect of the envelopes that were photocopied. See Matter of Rules Adoption, 120 N.J. 137, 150, 576 A.2d 274 (1990). The only reason these letters were intercepted and the envelopes copied was the request of the prosecutor. Had the jail authorities not been alerted, the letters would have been received by the defendant in the normal course without *65 incident. Consequently, the very corroboration by which the State seeks to establish the anonymous informant's reliability was illegally obtained. Had the warrant been authorized by a Superior Court judge, its validity would have been undermined by the warrantless searches by which the corroborating information was obtained.
Accordingly, defendant's motion to suppress the documents and materials seized from him during the search of his bed and dormitory area at the Passaic County Jail is granted.