**UNITED STATES of America**

v.

**Robert BANKS, Defendant.**

**No. 99 CR. 1048(DC).**

United States District Court, S.D. New York.

June 26, 2001.

Mary Jo White, by Marc L. Mukasey, Richard J. Sullivan, Assistant United States Attorneys, New York City, for the Southern District of New York.

Seiff Kretz & Maffeo, LLP, by J. Bruce Maffeo, Roland R. Acevedo, New York City, for defendant.

## MEMORANDUM DECISION

CHIN, District Judge.

On October 12, 1999, defendant Robert Banks was driving a mini-van when he was arrested by members of the Drug Enforcement Administration Task Force (the "Task Force") pursuant to an arrest warrant. The officers did not have a search warrant for the van, but they eventually conducted an "inventory" search of the vehicle. They discovered a compartment hidden in the floor of the van containing heroin, a loaded .45 caliber handgun, and other contraband.

Banks moves to suppress the evidence recovered from the search of his van on the grounds that the search was not a legitimate inventory search but rather was an investigatory search for which a warrant was required. I conducted an evidentiary hearing on May 18 and June 12, 2001. For the reasons that follow, the motion is denied.

The following constitute my findings of fact and conclusions of law.

### THE FACTS

#### 1. *Banks's Arrest*

On October 12, 1999, a federal grand jury indicted Robert Banks and six other individuals for murder-for-hire and weapons and narcotics violations. Arrest warrants issued. That evening, officers from the Task Force, including Detectives Eugenio Torriente and Armando Rodriguez, attempted to execute warrants for Banks and two others. (Transcript of Suppression Hearing held May 18, 2001 ("5/18 Tr.") at 80–81; Transcript of Suppression Hearing held June 12, 2001 ("6/12 Tr.") at 6). At approximately 9:30 p.m., the officers spotted Banks driving a green Ford Aerostar mini-van in the Bronx, and trailed him for approximately fifteen minutes before he pulled into a parking lot.

(5/18 Tr. at 82; 6/12 Tr. at 7). As Banks, the sole occupant of the vehicle, exited from the van, he was placed under arrest by Detective Rodriguez. (5/18 Tr. at 82, 109; 6/12 Tr. at 7–9).

Following the arrest, Rodriguez conducted a cursory search of the van's "immediate lungible area" in and around the front seats of the vehicle. (5/18 Tr. at 83–84, 109–110, 112; 6/12 Tr. at 9). No evidence was recovered as a result of this initial search. (5/18 Tr. at 84; 6/12 Tr. at 9). At the time of the arrest, the officers had information as to Banks's potential whereabouts and a general description of the van, but did not have any specific information that the van contained drugs or weapons. (5/18 Tr. at 107–08).

The officers transported Banks and the mini-van to the Task Force office in Manhattan (the "DEA Office"). There, officers photographed and fingerprinted Banks and took his pedigree information; the mini-van was parked in a downstairs garage. (5/18 Tr. at 84; 6/12 Tr. at 8–10). When the processing was complete, Rodriguez advised Banks of his rights and Banks indicated that he was willing to make a statement. After Banks answered several questions in an evasive manner, however, Rodriguez ended the interview. Without seeking Banks's consent, the detective proceeded to the garage to conduct an inventory search of the mini-van.[1] (6/12 Tr. at 10–14).

## 2. *NYPD and DEA Policies Concerning Inventory Searches*

The NYPD and DEA both had written policies concerning inventory searches in effect as of October 12, 1999. The NYPD's policy is set forth in the NYPD Patrol Guide (the "Patrol Guide").[2] (5/18 Tr. at 85–87; GX 103). Pursuant to this policy, police officers must conduct an inventory search of any property that comes into NYPD custody. If the property to be inventoried is in an automobile, officers are directed to search the interior of the vehicle thoroughly, including all areas that may hold valuables. The Patrol Guide explicitly lists the glove compartment and "under the floor mats" as areas that could potentially contain valuables and thus must be searched. (5/18 Tr. at 87–88; GX 103). According to the Patrol Guide, such inventory searches serve to "protect property, ensure against unwarranted claims of theft, and protect uniformed members of the service and others against dangerous instrumentalities." (GX 103; 6/12 Tr. at 34–35).

The DEA's policy regarding inventory searches is contained in the DEA Agent Manual and provides that "all property taken into the DEA custody for safekeeping will be thoroughly inventoried, including opening locked containers to inventory their contents," to protect the DEA from any claims for lost or missing property.[3]

---

1. In light of Detective Rodriguez's testimony, I reject Banks's version of these events. According to Banks, when he arrived at the DEA Office, he was "periodically interrogated, screamed at, ... [and] verbally threatened." (5/18 Tr. At 129). He also testified that Rodriguez attempted to obtain Banks's consent to search the van, and became enraged when Banks refused to sign a consent form. (*Id.* at 130–31).

2. The Patrol Guide introduced into evidence by the Government took effect January 1, 2000; however, Detective Torriente testified that the policy embodied in the 2000 Patrol Guide was the same as that in effect as of October 12, 1999. (5/18 Tr. at 86–87).

3. The DEA Agent Manual introduced into evidence by the Government took effect in 2000; however, Detective Torriente testified that the policy embodied in the 2000 DEA Agent Manual was the same as that in effect as of October 12, 1999. (5/18 Tr. at 89).

(GX 104). Detective Rodriguez was familiar with both the NYPD and DEA policies when he conducted an inventory search of Banks's minivan on the night of October 12–13, 1999. (6/12 Tr. at 14).

### 3. Search of the Mini–Van

At approximately 1:30 a.m. on October 13, 1999, Detective Rodriguez, in the presence of Detective Torriente and another officer, conducted an inventory search of the van pursuant to the NYPD and DEA procedures. (5/18 Tr. at 90–92; 6/12 Tr. at 13, 46). The search was conducted in part to secure any property Banks might have had in the vehicle, to protect the police from unwarranted claims of theft, and to safeguard against potentially dangerous objects or weapons. (6/12 Tr. at 35). Rodriguez also conducted the search in part to determine whether the van contained any contraband or evidence.

Rodriguez first opened all the doors to the vehicle and began to search in and around the front seats. (*Id.* at 15–16). He recovered from the driver's side overhead visor a small wallet containing insurance and registration forms, as well as apparent drug records. (5/18 Tr. at 92, 116; 6/12 Tr. at 15–17). Rodriguez then searched under the two front passenger seats and the glove compartment, finding no property or contraband. (*Id.* at 18).

Rodriguez then moved to the center row of seats.[4] He looked under the center bench seat, found nothing, and turned his attention to the floor covering, a gray carpet-like material. (6/12 Tr. at 18–19; GX 116(b)).[5] The floor covering, described by Detective Rodriguez as a "mat," ran across the width of the mini-van, beginning a few inches behind the front seats and extending to the back of the middle bench seat. (6/12 Tr. at 18–19, 51–52; GX 116(b)). A strip of plastic was sewn along the mat's front edge. (6/12 Tr. at 19; GX 116(b)–(d)). Rodriguez lifted up the mat by the edge, revealing a felt-like material covering the floor and a clearly visible trap door, approximately twelve by eight inches, cut out of the metal flooring but in a closed position.[6] (5/18 Tr. at 97–98, 118–120; 6/12 Tr. at 20, 33). Rodriguez grabbed the front lip of the door and, with some pressure, pulled the door open. (*Id.* at 20, 32–33). Inside the trap were a loaded .45 caliber pistol, ten glassines of heroin, and two bars of mannite, a cutting agent for heroin. (5/18 Tr. at 95; 6/12 Tr. at 20–21; GX 108–112). Rodriguez then removed the items and completed the inventory search by checking the rear of the vehicle.[7] (6/12 Tr. at 22).

Thereafter, Rodriguez prepared a written inventory of property taken from Banks and the mini-van at the time of the arrest and inventory search. (*Id.* at 22;

---

**4.** The mini-van had three rows of seats: two front bucket seats, a long bench seat in the rear, and a shorter bench seat in the middle. (6/12 Tr. at 18).

**5.** GX 116(a)–(i) are photographs of the mini-van taken by Detective Rodriguez shortly before the second day of the hearing. Although the mini-van is now owned by an individual unrelated to the instant case, the interior of the mini-van appears the same in the photographs as it did in October 1999. (6/12 Tr. at 24–27).

**6.** When asked to compare the trap in Banks's mini-van to traps discovered during other inventory searches, Detective Torriente described the former as "very obvious to the naked eye." (5/18 Tr. at 124).

**7.** In light of both detectives' testimony, as well as the photographs of the van's interior, I reject Banks's description of the trap. Banks testified at the hearing that the trap was covered with at least five layers of material and could only be accessed by opening the van's sliding door, removing a light in the door, and pulling a nylon string hidden among many wires. (5/18 Tr. at 132–33, 146–47).

GX 115). Several personal items, including a bag of miscellaneous items found in the mini-van, were eventually returned to Banks's brother on October 18, 1999.[8] (6/12 Tr. at 23–24).

The actions of Detective Rodriguez during the inventory search were fully consistent with DEA and NYPD policy, as the practice in inventory searches is to look under any floor mats. (5/18 Tr. at 122–23; 6/12 Tr. at 34–35). In addition, it is a standard practice of the Task Force and the NYPD to remove the contents of a trap discovered during an inventory search. (5/18 Tr. at 98). The inventory search procedures, while thorough, allow an officer to conduct a far more limited search than that permissible with a search warrant. Had the officers searched the mini-van pursuant to a search warrant, they would have dismantled the doors, dashboard, and seats of the vehicle, raised the vehicle up on a lift to examine its underside, and otherwise conducted a much more thorough search of the vehicle for hidden traps. (6/12 Tr. at 35–36).

## DISCUSSION

### A. *Applicable Law*

■ Inventory searches fall within a "well-defined exception to the warrant requirement of the Fourth Amendment," *Colorado v. Bertine*, 479 U.S. 367, 371, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987), and thus do not require a showing of probable cause. *See Illinois v. Lafayette*, 462 U.S. 640, 643, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983); *United States v. Santos*, 961 F.Supp. 71, 72 (S.D.N.Y.1997). Such searches are deemed to be reasonable under the Fourth Amendment because they serve important, non-investigatory government interests, such as the protection of property while in police custody and the protection of police from dangerous instrumentalities and unwarranted claims of lost or damaged property. *See United States v. Thompson*, 29 F.3d 62, 65 (2d Cir.1994) (citing *Bertine*, 479 U.S. at 372, 107 S.Ct. 738). Contraband discovered during the course of a valid inventory search may be lawfully seized by the police. *See United States v. Foreman*, 993 F.Supp. 186, 191 (S.D.N.Y.1998) (citing *Thompson*, 29 F.3d at 65).

■ An inventory search must be conducted in good faith pursuant to "standardized criteria or ... established routine." *Thompson*, 29 F.3d at 65 (quoting *Florida v. Wells*, 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990)). Inventory procedures need not be in writing; testimony of an agency's standard practices is sufficient to establish their existence. *See Thompson*, 29 F.3d at 65. Although the requirement of standardized procedures provides a necessary restraint on police conduct, it does not preclude police officers from exercising some discretion during an inventory search. So long as the officer exercises discretion "according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity," the inventory search will not violate the Fourth Amendment. *Bertine*, 479 U.S. at 375–76, 107 S.Ct. 738. Likewise, if standardized procedures are carried out in good faith, police are not required to use the least intrusive means to effectuate an inventory search. *See id.* at 374, 107 S.Ct. 738; *Lafayette*, 462 U.S. at 647–48, 103 S.Ct. 2605.

---

**8.** Although the inventory form was prepared by Detective Rodriguez, the description of the bag taken from the mini-van was actually written by Cesar Banks at the time he signed for his brother's property. At that time, Detective Rodriguez asked Banks to add the bag of miscellaneous items to the list when he handed over Banks's personal items. (6/12 Tr. at 23–24, 59).

While an "inventory search must not be a ruse for a general rummaging … to discover incriminating evidence," *Wells*, 495 U.S. at 4, 110 S.Ct. 1632, "the fact that [an] officer may harbor an investigatory motive does not invalidate an otherwise appropriate inventory search." *Santos*, 961 F.Supp. at 72; *see also United States v. Flores*, 122 F.Supp.2d 491, 495 (S.D.N.Y. 2000); *Foreman*, 993 F.Supp. at 191 n. 3. Accordingly, the key issue is whether the officers conducting the inventory search "act[ed] in bad faith or solely for the purpose of investigation." *Thompson*, 29 F.3d at 65 (citing *Bertine*, 479 U.S. at 372, 107 S.Ct. 738). If the answer is yes, the court must suppress the fruits of the inventory search.

**B.** *Application*

Here, Banks seeks to suppress the evidence obtained from the trap as the fruit of an illegal search. He contends that the officers set out to arrest him in his minivan specifically so they could search his vehicle. The resulting inventory search, according to Banks, was actually a pretextual rummaging for evidence conducted solely for investigatory purposes. These contentions are rejected.

Upon review of the evidence presented at the hearing, I conclude that Detective Rodriguez did not act in bad faith or for purely investigatory motives. Rodriguez conducted the inventory search of the mini-van pursuant to procedures that mandated a thorough search of the vehicle and directed him to look, among other places, under any floor mats. Once he lifted the mat and saw the clearly visible

outline of the trap door, Rodriguez was obligated, under these procedures, to open the trap because it could have contained valuables or dangerous instrumentalities. Given this obligation, Rodriguez's actions were justified. Moreover, the fact that Rodriguez prepared a list of Banks's personal items and handed them over to his brother supports the conclusion that the inventory search was not conducted solely for investigatory purposes.[9] Even if Rodriguez did harbor a hope or motive that the trap would reveal evidence, such a motive does not invalidate an otherwise valid inventory search conducted pursuant to reasonable police procedures. *See Flores*, 122 F.Supp.2d at 495; *United States v. Foreman*, 993 F.Supp. 186, 191 n. 3 (S.D.N.Y.1998); *Santos*, 961 F.Supp. at 72; *United States v. Palacios*, 957 F.Supp. 50, 53 (S.D.N.Y.1997).

As an alternative argument, Banks contends that the evidence seized from the trap should be suppressed because Rodriguez's actions (specifically, his lifting of the mat) did not comport with NYPD guidelines. Banks does not challenge the reasonableness of the procedure allowing officers to look underneath floor mats; rather, he maintains that Rodriguez pulled up the *carpeting* of the mini-van, an act unauthorized by the Patrol Guide. (6/12 Tr. at 63–64). I am unpersuaded by this argument. Whether the floor covering is more properly described as a mat or as carpeting, the photographs of the mini-van's interior clearly show a seam: even if the floor covering was constructed out of carpeting, it had a highly visible plastic

---

9. I do not find significant the fact that the non-contraband items seized from the van were listed in Cesar Banks's handwriting. Rodriguez testified that he had Cesar Banks add the bag of miscellaneous items to the list when he handed over Banks's personal items. (6/12 Tr. at 23–24, 59). That he made sure

the list included the bag, in my view, speaks to Rodriguez's concern that there be a record of the items (presumably, to protect the police from liability). As explained above, this is precisely type of concern an inventory search is designed to allay. *See Bertine*, 479 U.S. at 372, 107 S.Ct. 738.

edging. (GX 116(b), (d)). A reasonable officer, upon seeing such a covering, would correctly identify the material as a floor "mat" within the meaning of the Patrol Guide. Significantly, the mat here was not a piece of carpeting firmly attached to the floor that could only be removed with a knife or other cutting tool. Had Detective Rodriguez removed such a material in such a manner, he would have exceeded the inventory search procedures set forth in the Patrol Guide. Here, however, the detective stayed within those guidelines. The search thus must be upheld.

I also note that the search is not invalidated merely because the evidence was obtained from a secret compartment. Although the case law is sparse, at least two other courts have upheld the validity of inventory searches that revealed secret compartments or "traps" in the floors of vehicles. *See United States v. Arango*, 879 F.2d 1501, 1507 n. 2 (7th Cir.1989), *cert. denied*, 493 U.S. 1069, 110 S.Ct. 1111, 107 L.Ed.2d 1019 (1990) (holding that even if search revealing trap was not justified as search incident to arrest, it was justified as a lawful inventory search); *United States v. Lomeli*, No. 94 CR 173-1, 1995 WL 248039, *2, 1995 U.S.Dist. LEXIS 5516, at *4–7 (E.D.Ill.1995), *aff'd*, 76 F.3d 146 (7th Cir.1996) (holding that search revealing trap was a valid inventory search); *but see United States v. Thomas*, 787 F.Supp. 663, 688 (E.D.Tex.1992), *aff'd*, 983 F.2d 1062 (5th Cir.1993) (exploration of trap door mechanism in defendant's car was conducted for investigatory rather than inventory reasons, and was thus not a valid inventory search). Here, the trap was a fairly obvious one.

The Government's argument that a police officer, in conducting an inventory search, may look for and open traps found in an automobile gives me some pause, for I am concerned that the requirement of a warrant for the search of an automobile will be undermined if police officers conduct investigatory searches of automobiles under the guise of an inventory search instead of seeking an appropriate search warrant. I am persuaded here, however, that Detective Rodriguez acted in good faith. The NYPD and DEA policies required police officers to look under floor mats and open any traps, and that is what Detective Rodriguez did. Even though Rodriguez undoubtedly was motivated in part by a desire to find and uncover incriminating evidence, he also was acting in part to identify and inventory any personal property, contraband or otherwise.

There are important differences between an inventory search and an investigatory search of a car. In a true investigatory search, an officer will conduct a much more thorough search of the car; the officer, for example, may remove the dashboard and seats and place the car on a lift to look for sophisticated and hidden traps. As discussed above, however, important policy considerations exist for permitting police officers to conduct inventory searches without first obtaining a warrant. In this case, the search conducted by Detective Rodriguez fell within the parameters of a lawful inventory search. Accordingly, the motion to suppress is denied.

### CONCLUSION

For the foregoing reasons, defendant's motion to suppress the evidence seized from the trap in the mini-van is denied.

SO ORDERED.