UNITED STATES of America, Appellee,

v.

Earl THOMPSON, Defendant–Appellant.

No. 1148, Docket 93–1602.

United States Court of Appeals,
Second Circuit.

Argued March 24, 1994.

Decided July 6, 1994.

William I. Aronwald, Aronwald & Pykett, White Plains, NY, for defendant-appellant.

Marjorie Miller, Asst. U.S. Atty. for the S.D. of N.Y., New York City (Mary Jo White, U.S. Atty. for the S.D. of N.Y., John W. Auchincloss II, Asst. U.S. Atty. for the S.D. of N.Y., of counsel), for appellee.

Before OAKES, MESKILL, and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendant-appellant Earl Thompson appeals from a judgment entered on August 23, 1993 after a jury trial in the United States District Court for the Southern District of New York (Broderick, *J.*), convicting him of one count of knowing possession of a false Social Security card in violation of 18 U.S.C. § 1028(a)(6), three counts of bankruptcy fraud in violation of 18 U.S.C. § 152, one count of perjury in connection with a separate civil judicial proceeding in violation of 18 U.S.C. § 1623, and seven counts of laundering the proceeds of bankruptcy fraud in violation of 18 U.S.C. §§ 1956(a)(1) and 1957. Thompson was sentenced to serve 65 months' imprisonment, followed by a three-year term of supervised release, and a total of $600 in special assessments.

On appeal, Thompson challenges both his conviction and sentence. Regarding his conviction, Thompson challenges the district court's denial of his motion to suppress the contents of a briefcase discovered during an inventory search of his automobile, claiming that the search violated his Fourth Amendment rights. In addition, Thompson contends that the prosecutor's improper comments in rebuttal summation deprived him of a fair trial. Regarding his sentence, Thompson claims that the district court erred in

declining to downwardly depart from the calculated Sentencing Guidelines range.

For the reasons set forth below, we affirm the district court's judgment.

## BACKGROUND

On March 5, 1990, an officer of the Ramapo, New York Police Department ("R.P.D.") arrested Thompson for driving while intoxicated shortly after Thompson drove away from his residence. The arresting officer detained Thompson based on information that the R.P.D. received from an undercover agent, who had observed Thompson at home in an intoxicated condition shortly before he began driving his car. At the time of his arrest, the R.P.D. was conducting an undercover investigation of Thompson for alleged sexual assault.

Following his arrest, Thompson's vehicle was impounded and subjected to an inventory search. Pursuant to R.P.D. regulations, a detailed inventory of the entire vehicle was conducted. During the course of the search, an officer examined the contents of a closed briefcase, which was unlocked with Thompson's key. The briefcase contained approximately $23,500 in cash, $15,000 in postal money orders, $200,000 in bank and teller checks, a metal plate facsimile of a Social Security card, and documents relating to various bank accounts maintained under a variety of names. After preparing an inventory report, the R.P.D. turned the contents over to the Federal Bureau of Investigation (the "FBI").

The FBI's investigation disclosed that Thompson, an attorney admitted to the bar in New York State, had filed for bankruptcy protection on January 22, 1990. Although Thompson claimed in his petition to have assets totalling only $1,500, the FBI's investigation revealed that during the pendency of his bankruptcy proceeding, Thompson concealed approximately $400,000 in assets from the Bankruptcy Court. The investigation further indicated that Thompson laundered much of that money through bank accounts he opened by using fictitious names, addresses, and Social Security numbers. On March 8, 1990, three days after the seizure of the

briefcase, Thompson voluntarily dismissed his bankruptcy petition.

On June 6, 1991, an indictment was filed against Thompson concerning his alleged bankruptcy fraud. Ten days later, Thompson moved to suppress the contents of the briefcase seized from the trunk of his car. A suppression hearing was conducted, and on August 14, 1991, the district court denied Thompson's motion. A thirteen-count superseding indictment was filed against Thompson on October 29, 1991. Count One charged Thompson with knowing possession of a false Social Security card in violation of 18 U.S.C. § 1028(a)(6), Counts Two through Four charged Thompson with bankruptcy fraud in violation of 18 U.S.C. § 152, Count Five charged Thompson with making a false declaration in a proceeding before the United States District Court for the Southern District of New York in violation of 18 U.S.C. § 1623, and Counts Six through Twelve charged Thompson with laundering the proceeds of a bankruptcy fraud in violation of 18 U.S.C. §§ 1956(a)(1) and 1957. Count Thirteen charged that specific properties involved in or traceable to the money laundering violations set forth in Counts Six through Twelve were subject to forfeiture, pursuant to 18 U.S.C. § 982.

During the course of a six-day jury trial, Thompson testified that neither the briefcase nor the bulk of the money in the bank accounts belonged to him. To demonstrate Thompson's lack of credibility, the Government adduced evidence that Thompson had submitted false statements or false testimony in six legal proceedings. Additionally, Thompson admitted to filing false court papers that resulted in his disbarment in New York State.

On summation, defense counsel suggested that Thompson had answered all the questions honestly, and stated, "He does not have the best background, ... but does that mean he's a liar?" In rebuttal summation, the prosecutor stated, "Earl Thompson is a man who has lied in every piece of sworn testimony he has ever given in any court proceeding. He lied on every sworn statement he has ever filed." After objection by defense counsel, the district court instructed the jury that

the attorneys' statements did not constitute evidence. The jury returned a guilty verdict on all counts.

Following the verdict, the Probation Department prepared a Presentence Report ("PSR") for Thompson which recommended a total offense level of 25 and criminal history category of II, resulting in a sentencing range of 63–78 months. At sentencing, the district court declined to grant Thompson's request for a downward departure, accepted the findings of the PSR, and sentenced Thompson to 65 months' imprisonment.

Thompson now appeals.

## DISCUSSION

On appeal, Thompson contests both his conviction and his sentence. We have examined Thompson's challenge to his sentence and find it to be meritless. We discuss only Thompson's challenges to his conviction.

### (1) *The Inventory Search*

Thompson contends on appeal that the district court erred in denying his suppression motion because the inventory search was not conducted in good faith pursuant to a standardized procedure regulating the opening of closed containers. Thompson claims that the inventory search was a pretext to search for incriminating evidence. We disagree.

In examining a ruling on a motion to suppress, we review the district court's findings of adjudicative fact for clear error, and the district court's conclusions of law *de novo.* *See United States v. Moore*, 968 F.2d 216, 221 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 480, 121 L.Ed.2d 385 (1992).

■ As a preliminary matter, Thompson challenges his arrest, claiming that the stop was a pretext for conducting an inventory search. The question of whether the stop was pretextual or not, however, is irrelevant to determining the arrest's validity. So long as the stop was lawful, the resulting arrest will not violate the Fourth Amendment. *See United States v. Scopo*, 19 F.3d 777, 784 (2d Cir.1994). In this case, we find that the stop was clearly authorized by law. Thompson's detention was based on the R.P.D.'s first-

hand information from an undercover officer who alerted the R.P.D. that Thompson, who was visibly inebriated, planned to drive his automobile. Having received such information, it would have been irresponsible for the R.P.D. officer to allow Thompson to pose a threat to public safety by not stopping him. Accordingly, because the stop was lawful, the resulting arrest did not violate the Fourth Amendment. *See id.*

In addition to challenging his stop and arrest, Thompson challenges the inventory search itself on the grounds that the search was not conducted according to a valid procedure and was solely for the purpose of discovering incriminating evidence. Regarding the propriety of a search incident to an arrest, inventory searches of items lawfully obtained by the police fall within a well-defined exception to the Fourth Amendment's warrant requirements. *See Colorado v. Bertine*, 479 U.S. 367, 371–72, 107 S.Ct. 738, 740–41, 93 L.Ed.2d 739 (1987). Such searches are deemed reasonable under the Fourth Amendment because "inventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Id.* at 372, 107 S.Ct. at 741. The fruit of inventory searches, however, will be suppressed when the searching agents act in bad faith or solely for the purpose of investigation. *See id.*

■ Consistent with the Fourth Amendment, law enforcement officials may open closed containers as part of an inventory search so long as they act in good faith pursuant to "standardized criteria ... or established routine." *Florida v. Wells*, 495 U.S. 1, 4, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990) (citation omitted). The existence of such a valid procedure may be proven by reference to either written rules and regulations, *see United States v. Wilson*, 938 F.2d 785 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 946, 117 L.Ed.2d 115 (1992), or testimony regarding standard practices, *see United States v. Arango–Correa*, 851 F.2d 54, 59 (2d Cir.1988). Although the procedure must not be a pretext "for a general rummaging in order to discover incrimina-

ting evidence," it may allow the searching officers sufficient discretion in deciding whether or not to open a specific container. *Wells,* 495 U.S. at 4, 110 S.Ct. at 1635.

■ In the case at bar, we find two bases which support the existence of a standardized procedure that regulated inventory searches of closed containers. First, the written R.P.D. regulations provide:

A member of the Department who impounds any motor vehicle shall inventory the *contents* of the vehicle and record the results. . . .

It is not necessary to enter *locked portions* of any vehicle to conduct an inventory search when keys to enter are not available.

(emphasis added). Although Thompson maintains that the officers used impermissible discretion in conducting the inventory search because the regulations refer to "locked portions" and do not specifically mention the term "closed containers," we find this argument to be one of form over substance. The terms "contents" and "locked portions" in the regulations provide sufficient elucidation to satisfy the constitutional requirements for an inventory search of a closed container when keys are available. *See Wilson,* 938 F.2d at 789 (holding that the term "contents" satisfied *Wells* requirement even though policy did not use buzz words "closed container").

Second, the district court credited the testimony of two officers who stated that inventory searches are standard procedure upon the impounding of a vehicle. *See Arango–Correa,* 851 F.2d at 59 (holding testimony of agent established standardized practice). The officers testified that after such seizure, the R.P.D. assumes responsibility for the vehicle, and the searching law enforcement officials are required to inventory the entire car, including any closed containers or locked containers for which a key is available. Thus, the officers' testimony concerning the R.P.D.'s standard policy as well as the R.P.D.'s written regulations support the conclusion that the R.P.D. had adopted procedures that allowed the officers to search Thompson's briefcase.

In sum, beyond Thompson's bare allegation that the inventory search was a ruse to discover incriminating evidence, there is no evidence in the record that the inventory search was for any other purpose than to protect Thompson's property while in custody with the R.P.D. As noted above, the inventory search was done in compliance with the R.P.D.'s standardized regulations and established procedure. Accordingly, we agree with the district court that the inventory search comported with Fourth Amendment protections.

*(2) The Prosecutor's Rebuttal Summation*

■ Thompson's claim on appeal that the prosecutor's improper statements in rebuttal summation warrant reversal of his conviction also fails. In evaluating whether a prosecutor's improper remarks warrant reversal, we consider the severity of the offending conduct, the measures adopted to cure the harm of the statements, and the certainty of conviction absent the improper comments. *See United States v. Modica,* 663 F.2d 1173, 1181 (2d Cir.1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). In undertaking this analysis, we must examine the statements within the context of the entire trial in order to assess whether the prosecutor's remarks caused substantial prejudice to the defendant, thereby depriving him of his right to a fair trial. *See id.*

■ In applying the above analysis to the case at hand, we find that the prosecutor's remarks did not substantially prejudice Thompson so as to deprive him of a fair trial. While the Government concedes that the prosecutor misspoke during rebuttal summation, considering that Thompson placed his credibility in issue and that there was evidence in the record that he had filed false statements in numerous proceedings, we do not find the statements to have been overly inflammatory and egregious. *See id.; United States v. Peterson,* 808 F.2d 969, 977 (2d Cir.1987). Furthermore, given the overwhelming evidence of Thompson's guilt, we do not doubt that absent the improper comments, the jury would have convicted him. A review of the record indicates that Thompson was caught red-handed with thousands of

dollars of cash while claiming to be bankrupt. He also had documents in his possession showing that he had been moving funds in and out of accounts during that same period, and subsequently admitted to moving these funds. Thompson's story concerning the money and documents was implausible and did not square with prior sworn statements he had made. In sum, viewed within the context of the entire trial, we find that because the inappropriate comments did not amount to prejudicial error, reversal is not warranted. *See United States v. LaMorte,* 950 F.2d 80, 83 (2d Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1938, 118 L.Ed.2d 544 (1992).

## CONCLUSION

Based on the foregoing, we affirm the judgment of the district court.