**UNITED STATES of America**

v.

**Wayne CHIN, Defendant.**

**No. CR–92–407 (DRH).**

United States District Court,
E.D. New York,
Hauppauge Division.

July 25, 1994.

Zachary W. Carter, U.S. Atty., E.D.N.Y., Brooklyn, NY by Leonard Lato, Asst. U.S. Atty., for plaintiff.

Gary Schoer, North Shore Atrium, Syosset, NY, for defendant.

*FINDINGS OF FACT AND
CONCLUSIONS OF
LAW*

HURLEY, District Judge.

As the result of the defendant's motion to suppress a gun and ammunition clip which were seized on August 21, 1989, a hearing was held on April 11, 1994.[1] For the reasons explained below, that motion is denied.

---

1. The almost five year hiatus between the search and suppression hearing is attributed, in part, to

## FINDINGS OF FACT

### A. *Brian Bill*

The government's first witness, Police Officer Brian Bill, testified that on August 21, 1989 he was working the 4:00 p.m. to midnight shift at the 73rd Precinct in Brooklyn. At approximately 10:00 p.m., he was on routine motor patrol with his partner Alan Killagrew. While traveling eastbound on Livonia Avenue at approximately 15 miles per hour, a white Honda Prelude, according to Officer Bill, pulled up behind his vehicle, beeped its horn and then passed him by going over a double line. Upon seeing that traffic infraction, Officer Bill immediately activated his overhead light and siren, whereupon the Prelude pulled over to the side of the road. After the two officers exited their vehicle and approached the Prelude on foot, it suddenly accelerated and left the area at a high rate of speed. The officers returned to their car and gave chase.

As the Prelude entered the intersection of Saratoga Street and Livonia Avenue, two officers in another marked police car joined in the pursuit. The Prelude proceeded southbound on Chester Street which is a one way street for northbound traffic. From there, the cars traveled through the neighborhood and down a number of streets, including Bristol Street. When the Prelude, again proceeding against the flow of the one-way traffic, reached 407 Bristol Street it stopped. At that point, the driver existed and ran down an alleyway which separated two apartment buildings, followed closely by the four officers. One of the officers motioned for Officer Bill to return to the Prelude because its engine was still running, which he did.

While Officer Bill was in the alleyway he saw the driver of the Prelude, who it later developed was Mr. Chin, with a silver object in his hand.

Moments after Officer Bill returned to the Prelude, the officers emerged from the alley with Mr. Chin under arrest and the silver object, which was a .45 caliber gun, in hand.

the fact that there were related State proceedings, apparently including two State trials, which preceded the return of the Federal indictment.

A contemporaneous search of the Prelude produced a .45 caliber ammunition clip.

### B. *William Hare*

The government's second witness was Police Officer William Hare. At about 10:00 p.m. he was in a marked radio car with Officer Todd Kalt at the intersection of Saratoga Avenue and Livonia. At that time, he saw a white Prelude stationary by the side of the road. However, it suddenly sped away as two officers approached it on foot. He and his partner joined in the chase to 407 Bristol Street. He saw Mr. Chin throw a silver object in the alleyway. After Mr. Chin was subdued and handcuffed, that object was recovered and found to be a .45 caliber semi-automatic weapon.

Officer Hare testified that he first saw the other police car on Livonia at around 9:55 p.m., and that five minutes elapsed from that time until the three car arrived at 407 Bristol.

### C. *Todd Kalt*

The defense called one witness during the hearing, Police Officer Todd Kalt. His testimony essentially paralleled that of his partner, Officer Hare.

### D. *Stipulation*

Counsel stipulated that at 9:51 p.m. on August 21, 1989, the following radio transmission was made from the Bill–Killagrew police car to Central Dispatch: "there's a possible man with a gun."

### E. *Court's Concerns and Conclusions Regarding the Hearing Evidence*

One troubling aspect of the testimony concerns the times when various incidents are said to have occurred. Mr. Chin's vehicle passed Officer Bill's police car on Livonia Avenue at around 10:00 p.m. The time of the arrest in the courtyard behind 407 Bristol was 10:12 p.m. No one testified to seeing anything in Mr. Chin's hand until he was in the alleyway, only seconds before his arrest.

See May 10, 1994 letter of Gary Schoer, Esq., at p. 5, submitted in support of the relief requested.

Yet, approximately twenty minutes before that time, the radio message was transmitted. Indeed, the transmission occurred before Mr. Chin is said to have committed the traffic infraction which lead to him being stopped on Livonia Avenue.

Officer Bill had no recollection of the stipulated radio transmission being made. Neither did Officer Hare or Officer Kalt who could hear, over their car radio, any transmissions from the Bill–Killagrew vehicle. This collective failure to remember, coupled with the times involved, raise a series of questions. Was Mr. Chin pulled over because he drove over a double line, or because of certain information that Officer Bill had as reflected in the radio call? If he did commit the traffic infraction, was that a pretext for the stop, the true concern of Officer Bill being rooted in some information he had about Mr. Chin and a gun?

Or perhaps, the radio transmission did not pertain to Mr. Chin, but to another individual. That possibility may not be discounted, given the nature of the area that was being patrolled, where guns are commonplace. The fact that almost five years passed from time of the arrest until the officers testified at the suppression hearing could explain their failure to remember the radio call, particularly if it had nothing at all to do with Mr. Chin and was, accordingly, irrelevant to this case. Be that as it may, however, the inconsistency between the stipulation and the officers' testimony regarding when they learned that Mr. Chin might be in possession of a firearm, raises suspicions regarding Officer Bill's claimed reason for stopping the Prelude on Livonia Avenue. Under the circumstances, that testimony is not convincing.

Notwithstanding the muddled character of this first phase of the government's proof, I found each officer's testimony credible as to the events which transpired following the initial stop of the Chin vehicle. From that point forward, it is clear to me that what the officers said happened did, in fact, happen.

## CONCLUSIONS OF LAW

The ultimate burden of proof as to the legitimacy of the seizure in this case rests with the government. *United States v. Sac-*

co, 563 F.2d 552, 558 (2d Cir.1977), *cert. denied,* 434 U.S. 1039, 98 S.Ct. 779, 54 L.Ed.2d 789 (1978); *United States v. Levasseur,* 620 F.Supp. 624, 628 (E.D.N.Y.1985); 4 LaFave, *Search and Seizure,* § 11.2(b) at p. 218 (2d ed. 1987) ("With respect to the issue which is usually central in a motion to suppress hearing—the reasonableness of the challenged search or seizure—most states follow the rule which is utilized in the federal courts: if the search and seizure was pursuant to a warrant, the defendant has the burden of proof; but if the police acted without a warrant the burden of proof is on the prosecution.").

By way of format, the Court will initially focus on the stop of the Chin vehicle on Livonia Avenue, to be followed by an analysis regarding the events which occurred thereafter.

### A. *Stop on Livonia Avenue*

As indicated in the Findings of Fact section of this decision, *supra,* the government has not met its burden of proof to the extent it seeks to justify the challenged search on the basis of the initial stop. Of course, *if* Officer Bill observed the Prelude cross a double line, his stopping of the vehicle would have been authorized even if motivated by information he had concerning a possible weapon in the vehicle, rather than by the traffic infraction itself. As explained by Judge Altimari in *United States v. Thompson,* 29 F.3d 62 (2d Cir.1994) ("The question of whether the stop was pretextual or not ... is irrelevant to determining the arrest's validity. So long as the stop was lawful, the resulting arrest will not violate the Fourth Amendment," citing *United States v. Scopo,* 19 F.3d 777, 784 [2d Cir. 1994] ). The holdings in *Thompson* and *Scopo* are unavailing to the government, however, because the inconsistencies in the proof has caused me to reject, *in toto,* Officer Bill's explanation as to why the Chin vehicle was initially stopped. Absent that testimony, it necessarily follows that the stop on Livonia was violative of the Fourth Amendment, as not being supported by a "reasonable suspicion that illegal activity was afoot." *United*

*States v. Morrison,* 546 F.2d 319 (9th Cir. 1976).

The question now arises whether the government's alternative argument of attenuation is sufficient to validate the search.

## B. *Events After Livonia Avenue Stop*

■ If Mr. Chin had submitted to the unlawful stop on Livonia Avenue and the weapon and clip had then been discovered in a concomitant frisk or search at that location, the items clearly would be suppressed as the fruit of the unlawful stop. 4 LaFave, *Search and Seizure* § 11.4(d) at p. 408 (2d ed. 1987).

Instead of permitting the officers to conduct the stop, however, defendant fled. In the course of fleeing, he passed through a red light, drove the wrong way on a number of one way streets at a high rate of speed, in one instance forcing a motorist off the road, and committed other traffic offenses.

Although the traffic offenses presumably would not have occurred "but for" the unlawful stop, that fact alone does not preclude admissibility. *Dunaway v. New York,* 442 U.S. 200, 217, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979). "The relevant inquiry examines the extent of the casual connection between the lawless police conduct and the evidence in question; i.e., 'whether, granting the establishment of the primary illegality, the evidence to which instant objection is made has been made at the exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint,'" quoting from *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). *United States v. Bailey,* 691 F.2d 1009, 1053 (11th Cir.1982), *cert. denied,* 461 U.S. 933, 103 S.Ct. 2098, 77 L.Ed.2d 306 (1983).

A juxtapositioning of the facts in this case with the *Wong Sun* standard indicates—notwithstanding the temporal proximity between the initial stop and subsequent arrest—that the items seized are admissible. The defendant's flight, and subsequent violations of the law were not foreseeable, and constituted intervening acts free of the initial taint associated with the stopping of his vehicle on Livonia Street. *See United States v. Bailey,*

*supra,* 691 F.2d at pp. 1013–17; *United States v. Garcia,* 516 F.2d 318 (9th Cir), *cert. denied,* 423 U.S. 934, 96 S.Ct. 290, 46 L.Ed.2d 265 (1975) (defendant directed to pull over and stop at a highway checkpoint; he did so momentarily and then fled, leading the police on a high speed chase; he sought to suppress marijuana recovered from his vehicle when he was finally apprehended shortly thereafter, claiming that the evidence was tainted by the illegal checkpoint stop; the Ninth Circuit Court of Appeals (1) mentioned the *Wong Sun* balancing test previously discussed in the present decision, (2) assumed, *arguendo,* the illegality of the checkpoint stop and (3) held that the motion to suppress was properly denied because, *inter alia,* "the Border Patrol officers did not exploit the illegal stop in any way. The flight was the voluntary conduct of [the defendant].").

In the present case, discovery of the weapon in the alleyway by 407 Bristol Street, and the contemporaneous search of the Prelude which produced the ammunition clip (*United States v. Abel,* 707 F.2d 1013, 1015, n. 1 [9th Cir.1983], *rev'd on other grounds,* 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984)), did not, therefore, offend the Fourth Amendment.

■ A finding of admissibility in the case at bar is consistent with the policies underlying the exclusionary rule and the doctrine of attenuation. Evidence is suppressed to discourage the police from violating citizens' rights, but only at the expense of excluding otherwise competent evidence. Thus, in determining whether evidence should be excluded, a court should weigh the cost to society of excluding the evidence against the additional incentive exclusion would provide to police not to violate persons' constitutional rights. *See United States v. Ceccolini,* 435 U.S. 268, 279, 98 S.Ct. 1054, 1061, 55 L.Ed.2d 268 (1978).

■ Here, the costs to society of exclusion are significant. In an ordinary case, the exclusionary rule may cause relevant evidence not to be placed before the trier of fact. But in the case of unprovoked flight following an unlawful stop, the cost to society of exclusion following a second stop and ar-

**52**

rest is compounded for it would invite individuals to flee from officers endeavoring to effect an arrest. If the would-be arrestee escapes, he has evaded the law; if he does not, he has lost nothing vis a vis the evidence sought to be suppressed because the seizure of those items could not be validated as incidental to the second stop and lawful arrest. Such a result would be inconsistent with legitimate law enforcement concerns.

At the same time, permitting the use of the evidence in the present case is unlikely to weaken the deterrent effect of the exclusionary rule, as "flight in this setting is not a foreseeable consequence of the police activity in question ... and could not be counted on by the [police] to salvage an illegal search," *United States v. Sheppard*, 901 F.2d 1230, 1236 (5th Cir.1990). It should also be noted that, in the present case, only Officer Bill was involved in the initial stop. The arresting officer joined the chase after Mr. Chin had fled from Livonia Avenue. That officer, who incidentally also recovered the weapon, knew nothing of what had earlier occurred. Deterrent considerations are therefore irrelevant in evaluating his conduct.

## CONCLUSION

The weapon discarded by defendant in the course of his flight on foot was lawfully obtained by the police, as was the ammunition clip found as the result of the contemporaneous search of the Prelude on Bristol Street. Accordingly, the defendant's motion to suppress these items of physical evidence is denied.

SO ORDERED.