**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 07-4112
_____

UNITED STATES OF AMERICA

v.

ERIC WAYNE MUNDY,
a/k/a
BOOB,
a/k/a
JAMES FRAZIER

Eric Wayne Mundy,

Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Criminal No. 06-cr-00540-1)
District Judge: Honorable J. Curtis Joyner

Argued January 8, 2009

Before:  CHAGARES, HARDIMAN, <u>Circuit</u> <u>Judges</u>, and
ELLIS[*], <u>District</u> <u>Judge</u>.
_____

(Filed: September 14, 2010)

---

[*] The Honorable Thomas Selby Ellis III, Senior District
Judge for the United States District Court for the Eastern District
of Virginia, sitting by designation.

SARAH S. GANNETT (*argued*)
Assistant Federal Defender
DAVID L. MCCOLGIN
Assistant Federal Defender
Supervising Appellate Attorney
MAUREEN KEARNEY ROWLEY
Chief Federal Defender
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 540 West - Curtis Center
601 Walnut Street
Philadelphia, PA 19106
      *Counsel for Appellant*

PATRICK L. MEEHAN
United States Attorney
ROBERT A. ZAUZMER
FRANCIS C. BARBIERI, JR., ESQ.
MARY KAY COSTELLO, ESQ. (*argued*)
Assistant United States Attorney
Chief of Appeals
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
      *Counsel for Appellee*

_____

OPINION
_____

CHAGARES, <u>Circuit Judge</u>.

Eric Wayne Mundy appeals his conviction and sentence for possession of 500 grams or more of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B), and for possession with intent to distribute 500 grams or more of cocaine in a protected area, in violation of 21 U.S.C. § 860(a).  Mundy contends that the District Court erroneously admitted evidence that was seized during an inventory search of his car, in violation of the Fourth Amendment.  He also challenges the District Court's application of a United States Sentencing Guidelines ("U.S.S.G.")

enhancement for possession of a controlled substance in a protected location with intent to distribute. We will affirm.

I.

On August 3, 2004, Mundy was stopped by two Philadelphia Highway Patrol officers, James Chabot and George Soto, for making a right turn without using a turn signal and for excessively dark window tinting, in apparent violation of the motor vehicle code. The officers stopped Mundy at 18th Street and Hunting Park Avenue in Philadelphia, Pennsylvania, less than 1,000 feet from Gratz High School. The officers approached the vehicle and directed Mundy to lower the driver's side window. Mundy was unable to do so, and the officers instructed him to open his door instead, which he did. Officer Chabot asked Mundy for his license, insurance card, and registration. After several minutes of searching, he was unable to locate documentation for the vehicle. The officers then took steps to determine whether the vehicle was registered. First, the officers ran a check on the vehicle's public Vehicle Identification Number, and a check of the license plate number, neither of which produced a record of an owner. The officers then contacted the Bureau of Motor Vehicles (the "BMV"). The BMV reported no registration information for Mundy's vehicle. The officers directed Mundy to exit his vehicle, and they placed him in their patrol car before radioing for a tow truck.

Officer Chabot began to search the interior of the vehicle and, using a key Mundy provided, opened the locked trunk. The only items in the trunk were a tool kit and a gray plastic bag containing a closed shoebox. Officer Chabot removed the shoebox from the plastic bag and proceeded to open it. Inside, he found a brown paper lunch bag and two clear plastic zip-locked bags filled with a substance that appeared to be cocaine. Officer Chabot opened the paper lunch bag and found four more clear plastic zip-locked bags, also containing a substance that appeared to be cocaine. Officer Chabot replaced the items, closed the trunk of the vehicle, placed Mundy under arrest, and recovered $1,107 in cash from his person. The officers then notified narcotics agents. They did not complete a Towing Report listing the items found during

3

the search.

Officer Trappler of the Narcotics Field Unit was assigned to the investigation. He obtained and executed a search and seizure warrant for Mundy's vehicle and recovered from the trunk, among other things, six clear plastic bags containing a substance suspected to be cocaine. Officer Trappler also recovered from the interior of the vehicle two plastic jars, a small amount of marijuana, and documents. The Philadelphia Chemical Laboratory tested the substance found in the clear plastic bags and confirmed that the substance was cocaine. The cocaine weighed 746.9 grams.

Mundy was charged with one count of possession with intent to distribute 500 grams or more of cocaine, 21 U.S.C. § 841(a)(1), (b)(1)(B), and one count of possession with intent to distribute cocaine within 1,000 feet of a school zone, 21 U.S.C. § 860(a). Mundy moved to suppress the evidence found during the search, arguing that both the stop and the ensuing search violated his rights under the Fourth Amendment.[1] At the hearing on the motion to suppress, Officer Chabot testified that he found the cocaine during a routine inventory search of Mundy's car. Philadelphia police policy provides that before a vehicle is towed, its contents must be inventoried in order to protect the police from claims of missing property and damage. Mundy argued, in relevant part, that the officers did not have probable cause to search the vehicle, and that the inventory search policy did not sufficiently regulate the officers' discretion with respect to closed containers found in the vehicle. The District Court denied the motion to suppress, concluding that the search was conducted pursuant to a valid inventory search in accordance with departmental policy.

Mundy's case was tried to a jury beginning on July 17, 2007 and, on July 19, 2007, the jury returned guilty verdicts against Mundy on both counts. On October 9, 2007, the District Court sentenced Mundy on Count Two, the § 860(a) violation,[2] to

---

[1] Mundy does not challenge the legality of the stop on appeal. Mundy Br. at 10-11.

[2] Section 841(a) offenses are lesser-included offenses of § 860(a) offenses. See United States v. Jackson, 443 F.3d 293, 294-

4

seventy-eight months in prison, eight years of supervised release, a fine of $10,000, and a special assessment. Mundy filed a timely notice of appeal. [3]

## II.

Mundy contends that the District Court erred in admitting into evidence the cocaine seized during a warrantless inventory search of his car. In reviewing the denial of a motion to suppress alleging violations of the Fourth Amendment, we review factual findings for clear error and exercise plenary review over the District Court's legal conclusions. United States v. Williams, 417 F.3d 373, 376 (3d Cir. 2005). "Because the basis for denial of the motion was a determination that the search that produced the evidence was valid, we must review the propriety of the warrantless search that led to the discovery of incriminating evidence." Id.

## A.

The Supreme Court has recognized that "[t]he touchstone of the Fourth Amendment is reasonableness." Florida v. Jimeno, 500 U.S. 248, 250 (1991). Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies. California v. Acevedo, 500 U.S. 565, 580 (1991) ("It remains a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." (quotation marks omitted)); see also Katz v. United States, 389 U.S. 347, 357 (1967). "Such exceptions are based on the Supreme Court's determination that a particular search is reasonable, that is, that the government's legitimate interests in the search outweigh the individual's legitimate

---

95 (3d Cir. 2006).

[3] The District Court had jurisdiction over the underlying criminal prosecution pursuant to 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

5

expectation of privacy in the object of the search." United States v. Salmon, 944 F.2d 1106, 1120 (3d Cir. 1991).

The Supreme Court has determined that one exception to the warrant requirement is for inventory searches of lawfully seized automobiles. Colorado v. Bertine, 479 U.S. 367, 371 (1987); Illinois v. Lafayette, 462 U.S. 640, 643 (1983) ("[T]he inventory search constitutes a well-defined exception to the warrant requirement."); South Dakota v. Opperman, 428 U.S. 364, 372 (1976) ("[I]nventories pursuant to standard police procedures are reasonable."). Inventory procedures serve three "strong governmental interests": "[1] to protect an owner's property while it is in the custody of the police, [2] to insure against claims of lost, stolen, or vandalized property, and [3] to guard the police from danger." Bertine, 479 U.S. at 372.

Lawful inventory searches must be "conducted according to standardized criteria" or established routine, consistent with the purpose of a non-investigative search. Id. at 374 n.6. This requirement "tend[s] to ensure that the intrusion w[ill] be limited in scope to the extent necessary to carry out the caretaking function." Opperman, 428 U.S. at 375. The criteria or routine must limit an officer's discretion in two ways: first, as to whether to search the vehicle, and second, as to the scope of an inventory search. Salmon, 944 F.2d at 1120-21 (citing Florida v. Wells, 495 U.S. 1, 4-5 (1990); Bertine, 479 U.S. at 374 & n.6, 375-76). These limitations ensure that officers performing these caretaking functions are "'not [] allowed so much latitude that inventory searches are turned into a purposeful and general means of discovering evidence of a crime.'" Id. at 1120 (quoting Wells, 495 U.S. at 4 (quotation marks omitted)); see also Wells, 495 U.S. at 4 ("[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence.").

Mundy argues that the cocaine seized from the shoebox in the trunk of his car should have been suppressed because it was "the fruit of an illegal inventory search." Mundy Br. at 13-14. In particular, Mundy contends that although the Philadelphia Police Department did have a policy on inventory searches, the policy did

6

not address explicitly how closed containers were to be treated. Several decisions set the background for our analysis of this issue.

In Colorado v. Bertine, the Supreme Court considered whether, and under what circumstances, police may inventory the contents of closed containers found in vehicles lawfully taken into their custody. During the inventory search of Bertine's impounded vehicle, an investigating officer opened a closed backpack, a nylon bag within the backpack, and closed metal canisters located inside the nylon bag. 479 U.S. at 369. The officer found controlled substances, cocaine paraphernalia, and a large amount of cash in the canisters. Id. Reversing suppression of this evidence, the Court acknowledged that "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment." Id. at 374. The Court rejected the suggestion that police, before inventorying a container, "weigh the strength of the individual's privacy interest in the container against the possibility that the container might serve as a repository for dangerous or valuable items." Id. Rather, the Court observed, "[a] single familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the circumstances they confront." Id. at 375 (quotation marks omitted, alteration in original).

The Bertine Court added that nothing in its jurisprudence "prohibits the exercise of police discretion so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of criminal activity." Id. at 375. The Court held that there was no showing that the inventory search was "for the sole purpose of investigation." Id. at 372. Further, the Court noted that standard procedures governed the inventory search and that those procedures "mandated the opening of closed containers and the listing of their contents." Id. at 374 n.6. Accordingly, the Court held that the Fourth Amendment did not prohibit use of the evidence found during the inventory search of Bertine's vehicle.

In Florida v. Wells, the Supreme Court addressed how much discretion law enforcement officers may be afforded to open closed containers under inventory search policies for Fourth Amendment

7

purposes. The Court made clear that while law enforcement officers must not have "uncanalized discretion" in conducting inventory searches, "there is no reason to insist that they be conducted in a totally mechanical 'all or nothing' fashion." 495 U.S. at 4. Noting the important purposes of inventory searches, the Court recognized that law enforcement officers "may be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and the characteristics of the container itself." Id. The Court further explained that "while policies of opening all or no containers are unquestionably permissible, it would be equally permissible, for example, to allow the opening of closed containers whose contents officers determine they are unable to ascertain from examining the containers' exteriors." Id. Concluding, the Court observed that "[t]he allowance of the exercise of judgment based on concerns related to the purposes of an inventory search does not violate the Fourth Amendment." Id. Under the facts presented, the Wells Court held that marijuana discovered after police forced open a locked suitcase located in the trunk of an impounded vehicle was properly suppressed because the police department had "no policy whatever with respect to the opening of closed containers encountered during an inventory search." Id. at 4-5.

Following Bertine and Wells, this Court in United States v. Salmon considered whether a weapon found in a gym bag in the trunk of a vehicle pursuant to a purported inventory search should be suppressed. 944 F.2d at 1118. We began our analysis of the issue by recognizing that "pre-existing criteria or routine must limit an officer's discretion regarding the scope of an inventory search, particularly with respect to the treatment of closed containers." Salmon, 944 F.2d at 1120 (emphasis in original). We noted that although there was some evidence that the local government had a policy that all vehicles seized for forfeiture (as in Bertine) were searched, we concluded that "as in Wells, the government did not point to any standardized criteria or routine governing the scope of inventory searches." Id. at 1121 (emphasis in original). As a result of "the lack of evidence of any criteria or established routine regarding the scope of an inventory search," we concluded that the officers had exercised "impermissible discretion regarding the scope

8

of the inventory," and we accordingly held that the inventory search was unlawful.  Id.


B.


During a lawful stop based on suspected traffic violations, Philadelphia Highway Patrol officers determined that Mundy was in violation of § 1301(a) of the Pennsylvania vehicle code, which prohibits driving an unregistered vehicle.  75 Pa. Cons. Stat. § 1301(a)(1).  Under Pennsylvania law, if an officer determines that a driver is operating a vehicle in violation of, inter alia, § 1301(a), that vehicle may be impounded.  Id. § 6309.2 The Philadelphia Police Department has issued guidelines – known as Live Stop (the "PPD Live Stop Policy") – that implement the impoundment provisions of the Pennsylvania Vehicle Code, § 6309.2.  Appendix ("App.") 44.[4]  Once it is determined that the driver is in violation of § 6309.2, the PPD Live Stop Policy directs an investigating officer to inventory the contents of the vehicle taken into custody.  App. 45-46.

Mundy does not challenge the investigating officers' decision

---

[4] The PPD Live Stop Policy provides, in relevant part:

[T]he investigating officer[] shall . . . :

1.  Have the operator and occupants exit the vehicle and remain on location . . . .

2.  Complete the Towing Report by conducting a vehicle inventory describing any damage and/or missing equipment, personal property of value left in the vehicle by the operator/occupants[,] including the trunk area if accessible.

> NOTE:  No locked areas, including the trunk area, will be forced open while conducting an inventory.

App. 46.

9

to conduct an inventory search following the seizure of his vehicle. Instead, he argues that the officers exceeded their authority when they searched closed containers located in the trunk of the vehicle. He asserts that this case hews closely to Salmon and Wells, claiming that the PPD Live Stop Policy does not regulate inventory searches of closed containers.

Officer Chabot testified at trial that he searched Mundy's vehicle for "valuable items" and other kinds of "personal effects" before it was impounded, in accordance with the PPD Live Stop Policy. App. 92. The terms of that policy require the investigating officer to "[c]omplete the Towing Report by conducting a vehicle inventory describing any . . . personal property of value left in the vehicle by the operator/occupants[,] including the trunk area if accessible." App. 46. The PPD Live Stop Policy also limits the scope of the inventory search, instructing that "[n]o locked areas, including the trunk area, will be forced open while conducting an inventory." Id.[5]

Mundy contends that, because the PPD Live Stop Policy does not specifically mention the opening of closed containers, officers may not search closed containers found during a vehicle inventory search. We disagree. Inventory searches are not "totally mechanical" procedures. Wells, 495 U.S. at 4. Standardized criteria or routine may adequately regulate the opening of closed containers discovered during inventory searches without using the words "closed container" or other equivalent terms. We decline to create a rule of constitutional dimension that requires an inventory search protocol to predict every conceivable scenario an officer may

_____

[5] "The existence of . . . a valid [standardized inventory search] procedure may be proven by reference to either written rules and regulations or testimony regarding standard practices." United States v. Thompson, 29 F.3d 62, 65 (2d Cir. 1994) (citations omitted); see also United States v. Como, 53 F.3d 87, 92 (5th Cir. 1995) (upholding inventory search in the absence of a written policy, explaining that "testimony regarding reliance on standardized procedures is sufficient"). Here, both the written PPD Live Stop Policy and Officer Chabot's testimony established the standard departmental procedure regulating inventory searches.

10

happen upon while conducting an inventory search, and to provide a formulaic directive for each and every one. Such a requirement would not only prove unworkable, but would run contrary to the letter and spirit of Bertine and Wells. See United States v. Andrews, 22 F.3d 1328, 1336 (5th Cir. 1994) (upholding inventory search involving an officer's reading of incriminating evidence inside a notebook recovered pursuant to an inventory search, reasoning that neither Bertine nor Wells "requires a law enforcement agency's inventory policy to address specifically the steps that an officer should take upon encountering a closed container").

Instead, "reasonable police regulations relating to inventory procedures," Bertine, 479 U.S. at 374, mean that "[t]he policy or practice" is "designed to produce an inventory," Wells, 495 U.S. at 4, and that the criteria do not allow officers "so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of a crime.'" Id. (quoting Bertine, 479 U.S. at 376 (Blackmun, J., concurring)).[6] Those principles are satisfied

_____

[6] Accord United States v. Matthews, 591 F.3d 230, 238 (4th Cir. 2009) ("[W]ithin the constraints of the [applicable] policy, officers may exercise discretion in deciding whether or not to open a particular container."); United States v. Hall, 497 F.3d 846, 852 (8th Cir. 2007) ("That the Policy allows some discretion . . . does not make the inventory search unconstitutional."); United States v. Tackett, 486 F.3d 230, 232 (6th Cir. 2007) ("[O]fficers may exercise some judgment based on concerns related to the purpose of an inventory search; for example, they may decide to open particular containers if they cannot determine the contents." (quotation marks omitted)); United States v. Thompson, 29 F.3d 62, 65-66 (2d Cir. 1994) ("Although the [established inventory search] procedure must not be a pretext 'for a general rummaging in order to discover incriminating evidence,' it may allow the searching officers sufficient discretion in deciding whether or not to open a specific container." (quoting Wells, 495 U.S. at 4)); United States v. Gallo, 927 F.2d 815, 819 (5th Cir. 1991) ("The police department's inventory procedures can allow an officer 'latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself.'" (quoting Wells, 495 U.S. at

11

here.

The PPD Live Stop Policy explicitly sets out its objectives, namely, to protect the owner's property and shield the officers from claims of loss or damage. The Policy also sufficiently regulates the scope of the search, directing investigating officers to search all accessible areas of the vehicle (including the trunk), provided that they are not forced open, to determine if they contain "any . . . personal property of value," or other effects. App. 46. A search of unlocked containers that may hold such property or effects, as happened here, falls comfortably within the PPD Live Stop Policy's general directive, and therefore does not violate the Fourth Amendment. See Wells, 495 U.S. at 4.

Mundy's reliance on Wells and Salmon is misplaced. In each of those cases, the courts found that there was no standard policy or procedure governing the scope of inventory searches. In Wells, the closed container at issue was a locked suitcase that was forced open at the direction of a state trooper, and there was "no policy whatever with respect to the opening of closed containers." 495 U.S. at 4. The Court concluded that the search of the suitcase was unlawful, explaining that officers may not be given total discretion to decide whether to open a closed container found during an inventory search. Id. at 4-5. Similarly, in Salmon, the complete absence of a relevant inventory search protocol underscored our decision. Indeed, we explained that the Government had failed to "point to any standardized criteria or routine governing the scope of inventory searches." Salmon, 944 F.2d at 1121 (emphasis omitted). Wells and Salmon, therefore, exemplify "a prime danger of insufficiently regulated inventory searches:  police may use the excuse of an 'inventory search' as a pretext for broad searches of vehicles and their contents." Wells, 495 U.S. at 5 (Brennan, J., concurring).

In the present case, by contrast, the PPD Live Stop Policy restricted Officer Chabot from forcing open the trunk or any other

1)); United States v. Judge, 864 F.2d 1144, 1145 (5th Cir. 1989) (noting that "Bertine does not condemn all forms of police discretion, but only 'evidentiary' discretion which is exercised on the basis of suspicion of criminal activity").

locked areas of the vehicle. The Policy instructed him to inventory, inter alia, "any . . . personal property of value left in the vehicle by the operator/occupants[,] including the trunk area if accessible." App. 46. By specifically authorizing the search of the trunk "if accessible," and by forbidding any "locked areas, including the trunk area," from being "forced open," the Policy: (1) authorized Officer Chabot to inventory "any personal property of value" left in the trunk once Mundy provided the keys to it; and (2) simultaneously curtailed his authority to embark on a generalized search for incidents of crime. Though the PPD Live Stop Policy does not contain magic words relating specifically to closed containers, its reference to "any . . . personal property of value" sufficiently regulated the scope of a permissible inventory search, and therefore authorized the opening of the shoebox in Mundy's trunk to determine if such property was contained therein. Officer Chabot acted in accordance with standardized criteria; there is no evidence that he exercised unbridled discretion in choosing to open the unlocked container.

Our sister courts of appeals have reviewed questions similar to that posed here. In United States v. Wilson, 938 F.2d 785 (7th Cir. 1991), the Court of Appeals for the Seventh Circuit held that the inventory search policy governing the Illinois state police "clearly establishe[d] the policy that closed containers can be opened," id. at 790, even though the policy did not use the "buzz words 'closed container,'" id. at 789. The court held that the policy's requirement that the investigating officer examine and inventory the "contents" of the vehicle, together with the direction to restrict the search to areas where owners or operators would normally place personal property, sufficiently limited the officers' discretion. Id. at 790; see also United States v. Richardson, 121 F.3d 1051, 1055-56 (7th Cir. 1997) (reaffirming the holding in Wilson).

In United States v. Thompson, 29 F.3d 62 (2d Cir. 1994), the Court of Appeals for the Second Circuit considered facts that closely parallel this case. There, the court reviewed an inventory search of a locked briefcase (to which the defendant had provided the key) recovered from an impounded vehicle. Id. at 64. At issue was whether the applicable inventory search regulations provided

13

sufficiently standardized criteria to the officers conducting the inventory search. Id. at 65. The regulations stated in pertinent part: "A member of the Department who impounds any motor vehicle shall inventory the <u>contents</u> of the vehicle and record the results. . . . It is not necessary to enter <u>locked portions</u> of any vehicle to conduct an inventory search when keys to enter are not available." Id. at 66 (emphases in original). The court rejected the argument that police officers "used impermissible discretion in conducting the inventory search because the regulations refer to 'locked portions' and do not specifically mention the term 'closed containers.'" Id. Citing <u>Wilson</u>, the court explained that "[t]he terms 'contents' and 'locked portions' in the regulations provide sufficient elucidation to satisfy the constitutional requirements for an inventory search of a closed container when keys are available." Id.[7]

More recently, in <u>United States v. Matthews</u>, 591 F.3d 230 (4th Cir. 2009), an officer conducting an inventory search of an impounded vehicle discovered, <u>inter</u> <u>alia</u>, a substantial quantity of packaged cocaine in a closed suitcase recovered from the trunk. The defendant challenged the inventory search on the basis that the officer "could not have followed standardized criteria because the Department's policy does not specify how an officer should handle closed containers." Id. at 236. The Court of Appeals for the Fourth Circuit cited as authority <u>Wilson</u>, <u>Richardson</u>, and <u>Thompson</u>, and held that "[a] police department's policy on inventory searches does not have to specifically use the phrase 'closed containers' to permit the search and seizure of such items." Id. The court rejected the defendant's challenge to the inventory search, reasoning as follows:

> Like the policies discussed in <u>Thompson</u>, <u>Wilson</u>, and <u>Richardson</u>, the Department's policy, though not

---

[7] <u>See also</u> <u>State v. Mesa</u>, 717 N.E.2d 329, 334 (Ohio 1999) (upholding an inventory search where departmental policy "require[d] that 'open compartments of the vehicle are to be searched[,]' and that 'locked compartments shall not be opened,'" and concluding that "[b]y its very terms, this language does not prohibit officers from searching closed compartments[,]" but only prohibits opening those "that are locked").

14

explicitly using the phrase "closed containers," sufficiently regulates the opening of such containers to provide standardized criteria to justify Deputy Clark's search of Matthews's bags. That policy requires, in relevant part, for "[a] complete inventory [to] be taken on all impounded or confiscated vehicles including the interior, glove compartment and trunk." Only by opening all closed containers could a police officer effectively comply with this requirement for a "complete inventory." . . .

The circumstances in this case represent the typical situation in which the necessity of an inventory search arises. As the policy in question reflects, the purpose of conducting the inventory search is to protect the owner's property while in the custody of the police from "loss or theft." Only by performing a full inventory of the car – which includes opening closed containers – could an officer identify all the vehicle's valuables and effectively secure them. Accordingly, we agree with the district court that because the Department's policy authorizes the opening of closed containers encountered during an inventory search and Deputy Clark adhered to that policy, Deputy Clark's search falls within the inventory search exception and thus does not violate the Fourth Amendment.

Id. at 237-38 (citations omitted).[8]

For the reasons we have articulated, we agree with these courts. The inventory search protocols at issue in those cases are constitutionally indistinguishable from the PPD Live Stop Policy that Mundy challenges here. We hold that the Policy provided sufficiently standardized criteria regulating the scope of a permissible inventory search – including searches of closed containers – and that Officer Chabot's search adequately complied with those criteria.

Mundy also argues that the officers' reliance on the PPD Live Stop Policy was a pretext for an investigatory search because the officers did not complete a Towing Report and because the officers believed that they would find narcotics in the vehicle. First, the failure of the investigating officers to complete a Towing Report does not demonstrate that the officers conducted the inventory search as pretext or in bad faith. The record indicates that Officer Trappler produced an inventory of items seized from the vehicle on property receipts, including the narcotics, but that the officers did not complete a Towing Report describing personal effects left in the vehicle. App. 61.

Although compliance with procedures "tends to ensure the intrusion is limited to carrying out the government's caretaking function," failure to follow through with standard procedures does not necessarily render the search unreasonable. United States v. Mayfield, 161 F.3d 1143, 1145 (8th Cir. 1998); see also Whren v. United States, 517 U.S. 806, 816 (1996) ("[I]t is a long leap from the proposition that following regular procedures is some evidence of lack of pretext to the proposition that failure to follow regular procedures proves (or is an operational substitute for) pretext." (emphasis in original)); United States v. Trullo, 790 F.2d 205, 206 (1st Cir. 1986) ("We will not hold that the officer's failure,

---

[8] Notably, the Matthews court distinguished our decision in Salmon, emphasizing – as we have above – that there, "the law enforcement agency had 'no written policy regarding inventory search procedures,' much less one addressing closed containers." Matthews, 591 F.3d at 236 n.8 (quoting Salmon, 944 F.2d at 1121).

technically, to follow the inventory form procedures for valuables meant [that] it was not an inventory search."). The search in this case was undertaken pursuant to established procedures and standardized criteria designed to produce an inventory. After discovering controlled substances, the officers ended the inventory and called in narcotics investigators. "This change of plans does not render the search unreasonable . . . ." United States v. Woolbright, 831 F.2d 1390, 1394 (8th Cir. 1987).

Mundy also argues that the officers were motivated by the expectation of finding criminal evidence in his vehicle. Officer Chabot testified that, while Mundy was looking for his registration and insurance information, he observed what he believed to be a small marijuana bud on the driver's side of the car. App. 91, 95. Officer Soto testified that he noticed two vials "normally used for narcotics" in the center console. App. 100. In addition, both Officers Chabot and Soto testified that they detected a strong odor in the vehicle, which they identified as cocaine based on anecdotal evidence, including its distinctive scent. App. 95-96, 100. Such initial observations alone do not suggest that the subsequent inventory search was conducted in bad faith. See United States v. Lopez, 547 F.3d 364, 372 (2d Cir. 2008). As the court reasoned in Lopez,

> The Fourth Amendment does not permit police officers to disguise warrantless, investigative searches as inventory searches. However, the Supreme Court has not required an absence of expectation of finding criminal evidence as a prerequisite to a lawful inventory search. When officers, following standardized inventory procedures, seize, impound, and search a car in circumstances that suggest a probability of discovering criminal evidence, the officers will inevitably be motivated in part by criminal investigative objectives. Such

17

> motivation, however, cannot reasonably
> disqualify an inventory search that is
> performed under standardized
> procedures for legitimate custodial
> purposes.

Id. (citations omitted).

The District Court in the present case found that the officers "took the normal steps one would take" to search the vehicle prior to impoundment. App. 64. We see no error in this finding, and have no reason to doubt that the Supreme Court's standards for a warrantless inventory search were satisfied.

\* \* \* \*

We conclude that the search here did not violate the Fourth Amendment. The PPD Live Stop Policy adequately regulated the scope of the inventory search with respect to closed containers, and the search of Mundy's vehicle, conducted in accordance with those standardized procedures, was reasonable.

## III.

Mundy next argues that the District Court erred in applying a two-level enhancement to his U.S.S.G. offense level pursuant to U.S.S.G. § 2D1.2(a)(1). We engage in plenary review of the District Court's legal interpretation of the Guidelines. United States v. Aquino, 555 F.3d 124, 127 n.5 (3d Cir. 2009).

Section 2D1.2 provided for a two-level enhancement to the Guidelines offense level for, inter alia, offenses committed in violation of 21 U.S.C. § 860. See U.S.S.G. § 1B1.2(a) (requiring reference "to the Statutory Index (Appendix A) to determine the Chapter Two offense guideline"); U.S.S.G. App. A (2007) (making § 2D1.2 enhancement applicable to offenses committed under 21 U.S.C. § 860).[9] Mundy was convicted of possession of more than

_____

[9] Citing U.S.S.G. § 1B1.2(a), Mundy argues that the "Guidelines require that the district court apply the guideline

500 grams of cocaine within 1,000 feet of a school, in violation of 21 U.S.C. § 860(a). The District Court, therefore, applied the two-level enhancement.

Mundy makes two arguments as to why § 2D1.2(a)(1) nevertheless should be read not to apply to his possession with intent to distribute conviction, neither of which we find persuasive. First, Mundy argues that § 2D1.2(a)(1) does not apply because there is no evidence that he intended to distribute any drugs within 1,000 feet of a school (though he did possess them there). He argues specifically:

> It is uncontested that Mr. Mundy did not choose to stop in a protected location; he was ordered to stop within 1,000 feet of a school by police officers who observed his alleged commission of moving violations. But for the traffic stop, Mr. Mundy would have continued through the school zone and on to his ultimate destination.

Mundy Br. at 27. "[I]mportant public policy reasons," Mundy contends, dictate that the Guidelines treat possessors who do intend to distribute within a protected area different from possessors who intend to distribute elsewhere. Id. at 25.

We previously addressed a very similar issue – whether 21 U.S.C. § 860 (which triggers the § 2D1.2(a)(1) enhancement at issue here) applies to a possessor who did not intend to distribute in a protected area – in United States v. Rodriguez, 961 F.2d 1089 (3d Cir. 1992). In Rodriguez, the defendant argued that § 860 does not apply to a

assigned to each statute of conviction in Appendix A, not in the commentary," and that "Appendix A lists § 2D1.1 as the applicable guideline in § 860(a) cases." Mundy Reply Br. at 10. Mundy misreads Appendix A. Section 2D1.2 applies to violations of 21 U.S.C. § 860(a). See U.S.S.G. App. A (2007). Section 2D1.1 applies to violations of 21 U.S.C. § 860a – a statute different from § 860.

defendant who possesses drugs within 1,000 feet of a school but intends to distribute them elsewhere. 961 F.2d at 1091. After reviewing the plain language of the statute, as well as the legislative history, we concluded that § 860 applies to a defendant who possesses drugs within 1,000 feet of a school, even if the defendant intends to distribute them elsewhere. Id. at 1092. We rejected the argument that the statute should not apply to possessors who do not evidence an intent to distribute in a protected area, such as "a defendant who speeds by a school in a train or other vehicle on the way to a narcotics sale." Id. at 1094. Indulging this argument, we reasoned, "would make the statute inapplicable in several situations in which the mere possession of sizeable quantities of drugs near a school would create an increased risk for students." Id. Some of those risks include increased chance of violence, as well as loss, theft, or abandonment of the drugs. Id.[10] Our reasoning in Rodriguez, which led us to the conclusion that § 860 applies to possessors who do not intend to distribute in a protected area, suggests that § 2D1.2(a)(1) – a sentencing enhancement triggered by a violation of § 860 – applies to those possessors as well. Thus, Mundy's first argument fails.

Mundy's second argument fares no better. He points to an Application Note to § 2D1.2, which provided, in relevant part, "This guideline applies only in a case in which the defendant is convicted of a statutory violation of drug trafficking in a protected location." U.S.S.G. § 2D1.2 cmt. n.1 (emphasis added). "Drug trafficking" is not a defined term for purposes of § 2D1.2. Mundy contends that possession with intent to distribute does not constitute "drug trafficking" because "drug trafficking" entails the actual sale or distribution of drugs, and therefore does not trigger the § 2D1.2(a)(1) enhancement. In support of his contention, Mundy notes that Congress, for the purposes of 21 U.S.C. § 862, defines "drug traffick[ing]" to require actual distribution. See 21 U.S.C. § 862. Mundy posits that the phrase should carry that same meaning

_____

[10] We also noted that the statute may apply to a defendant who intends to sell drugs in a protected area, even when there is no increased risk to students, such as when school is not in session. Id. at 1094-95.

when used in the Application Note to U.S.S.G. § 2D1.2, an enhancement triggered by the violation of § 862's neighbor, § 860. Mundy Br. at 25.

Mundy's argument is unpersuasive in light of the Commentary to § 2D1.2's unequivocal instruction that § 2D1.2(a)(1) applies to drug offenses – like Mundy's – committed in violation of § 860. See U.S.S.G. § 2D1.2 cmt. Thus, Mundy's second argument fails.

We hold that the District Court did not err in applying a two-level enhancement to Mundy's Guidelines offense level under § 2D1.2(a)(1).

IV.

For the reasons stated above, we will affirm the judgment of conviction and sentence of the District Court.