NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0162n.06

Case No. 25-5713

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

Apr 10, 2026

KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE |
| v. | ) ) ) | |
| ARSENIO CLAYTON, | ) | |
| Defendant-Appellant. | ) ) | OPINION |

Before: GIBBONS, THAPAR, and LARSEN, Circuit Judges.

THAPAR, Circuit Judge. During a family fight, Arsenio Clayton fired a gun into the air. Deputies then found that loaded gun in a plastic grocery bag on top of Clayton's car. Clayton moved to suppress the gun as the product of an unlawful search. But the district court concluded that the deputies would have inevitably discovered the gun during an inventory search of Clayton's car. Seeing no error, we affirm.

I.

One morning, Shelby County Sheriff's Office deputies responded to a report that a man in a white shirt, black pants, and sunglasses had fired shots into the air outside an apartment complex. When the deputies arrived, they found Arsenio Clayton wearing the outfit described by the complainant. Clayton was trying to jumpstart his car, which he told the deputies had "broke[n] down" in the middle of the street. *See* R. 31, Ex. 1, 01:21. As the deputies approached, Clayton placed a gray plastic grocery bag on his car's roof. Clayton cooperated while the deputies patted

him down, assuring them that he didn't have any weapons on his person. He then explained that he had been arguing with his sister, who lived in a nearby apartment with her son.

Deputy Richard Phillips spoke with Clayton's nephew in the apartment's doorway. Clayton's nephew stated that Clayton had been "acting crazy" all night. R. 31, Ex. 2, 00:54. That morning, Clayton had argued with—and then threatened—his sister about belongings she left in his car. Clayton then "pulled out a gun and shot in the air." *Id*. at 01:04–01:06. He tried to drive away, but his car stalled in the street. Phillips asked the nephew if Clayton's firearm was still inside the vehicle. He responded, "More than likely, yeah." *Id*. at 01:24. The nephew then pointed out the location where the shell casing from Clayton's shot might have fallen. When the deputies searched that area, they discovered a spent casing about 15 feet behind Clayton's car.

Once the deputies recovered the shell casing, they handcuffed Clayton beside his car. Moments later, Clayton's sister emerged from her apartment and confirmed her son's account of the shooting to the deputies. At that point, the deputies arrested Clayton and placed him in the backseat of a cruiser.

Deputy Keith Keppen kept searching for the gun. He first looked inside the car, peering through the open driver's side door. He then turned to the plastic bag on the roof of the car, which was loosely tied at the top but had a tear near the bottom. When Keppen reached for the bag, he felt a hard object in it with "some weight to it." R. 47, Pg. ID 104. Through the tear, he "pulled [the object] out and a towel fell right off of it." *Id.* The object was a loaded handgun.

Meanwhile, Detective Dodson, an on-scene investigator, tried to make arrangements for Clayton's car. Dodson asked Clayton whether he wanted his car to be towed or left with his sister. After changing his mind several times, Clayton finally requested that his car be towed because his sister had "been trying to kill [him]." R. 31, Ex. 3, 00:30. Dodson assured Clayton that the

deputies would photograph his car to keep track of his belongings. Clayton replied, "Did they find the gun and a clip?" *Id.* at 01:09–01:11. Dodson interrupted, asking Clayton whether he wanted to start "saying things" to police. *Id.* at 01:13. Clayton declined, and Dodson didn't press him. A few seconds later, Clayton confirmed that the deputies could tow the car. When police towed Clayton's car, Deputy Phillips filled out an inventory form, but he didn't document Clayton's personal property on it.

A federal grand jury indicted Clayton for possessing a firearm as a felon. *See* 18 U.S.C. § 922(g)(1). Clayton moved to suppress the gun, alleging that the deputies' search of the plastic bag violated the Fourth Amendment. The district court referred the motion to a magistrate judge. *See* 28 U.S.C. § 636(b)(1)(B). After holding a hearing, the magistrate judge recommended denying Clayton's motion. The magistrate found that the police's "routine procedures . . . would have resulted in the eventual inventory of the contents of the bag and discovery of the gun." R. 33, Pg. ID 71 (citation modified). Clayton didn't object.

The district court reviewed the magistrate judge's findings de novo. *United States v. Curtis*, 237 F.3d 598, 602–03 (6th Cir. 2001). It then adopted the magistrate judge's report and followed its recommendation to deny Clayton's motion. Although Clayton didn't timely move to reconsider, the district court granted Clayton new counsel and allowed him to file untimely objections. After considering those objections, the district court agreed with the magistrate judge that "the gun would have inevitably been discovered during an inventory search of the vehicle after the tow." R. 59, Pg. ID 217. Clayton pled guilty but reserved his right to appeal the denial of the motion to suppress. The district court ultimately sentenced him to 87 months' imprisonment followed by 3 years of supervised release. Clayton timely appealed.

II.

Clayton argues that his gun should be suppressed as the proceeds of an unlawful search of his plastic bag. But even assuming an unlawful search occurred, the district court correctly found that suppression wasn't warranted because the deputies would have inevitably discovered Clayton's firearm during an inventory search of his car. [1]

The Fourth Amendment prohibits "unreasonable searches" of personal "effects." U.S. Const. amend. IV. The Supreme Court has interpreted this guarantee to require courts to exclude probative evidence acquired through an unlawful search. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). But the Supreme Court has also carved out numerous exceptions to the exclusionary rule.

One such exception is the doctrine of inevitable discovery. We allow the government to admit unlawfully obtained evidence if it can show that the evidence would have inevitably been acquired through lawful means. *Nix v. Williams*, 467 U.S. 431, 444 (1984). To determine whether discovery was inevitable, we ask what would have happened if the search had never occurred. *United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir. 1995). This prediction can't be purely "speculative." *Nix*, 467 U.S. at 444 n.5. So we look to routine procedure, policy, and practice to determine the likely course of the police investigation. *Kennedy*, 61 F.3d at 500–01.

An "inventory search" is one standard police procedure that commonly results in inevitable discovery. *Colorado v. Bertine*, 479 U.S. 367, 371–72 (1987). After law enforcement seizes a vehicle, officers often search the car and catalogue its contents to prevent theft, loss, or damage and protect the public from potentially dangerous contraband. *Id.* During this comprehensive

---

[1] The government argues that the deputies lawfully examined Clayton's bag, either as a search incident to his arrest or as part of the automobile exception to the warrant requirement. Because the district court correctly concluded that the inevitable-discovery doctrine applied, we don't address those alternative theories.

search of the vehicle, officers may use their "practical judgment" to decide whether to "open particular containers [when] they cannot determine the contents." *United States v. Hockenberry*, 730 F.3d 645, 659, 661 (6th Cir. 2013) (quotation omitted). So once police seize a vehicle, we can generally assume that any evidence subject to the department's stated inventory policy would inevitably have been discovered during a lawful search. *Kennedy*, 61 F.3d at 500–01; *United States v. Kimes*, 246 F.3d 800, 804 (6th Cir. 2001). That means the exclusionary rule doesn't apply to such evidence.

Since Clayton's car needed to be towed, the Sheriff's Office policy entitled the deputies to perform an inventory search. The Sheriff's Office advises deputies to tow a car if they have probable cause to suspect it "is needed for evidentiary purposes" or if the vehicle is "obstruct[ing]" traffic. R. 83-1, Pg. ID 392–93. Deputies may also tow a vehicle after arresting a suspect, provided they give the suspect the opportunity to park the car in a legal parking zone or leave it with a third party at the scene. If the owner doesn't authorize leaving the car with someone, and the car can't be properly parked, the deputies "should" tow it. *Id.* at 393.

Any of these provisions justified towing Clayton's car, regardless of the gun's discovery. First, the deputies had probable cause to suspect Clayton's gun—potential evidence of a crime— was "more than likely" in the car. R. 31, Ex. 2, 01:24. Second, the vehicle had "broke[n] down" in the middle of a public road, obstructing residents from exiting the apartment complex. R. 31, Ex. 1, 01:21. Third, after his arrest, Clayton stated that he would prefer the deputies tow his vehicle rather than leave it with his sister. On any of these grounds, the Sheriff's Office policy directed the deputies to tow Clayton's car.

Once the deputies decided to tow Clayton's car, an inventory search became inevitable. The Sheriff's Office policy mandates that "[v]ehicles *shall* be inventoried whenever they are

towed." R. 83-1, Pg. ID 395 (emphasis added). That inventory "*shall* include the area of the vehicle to which [the deputies] have access," including closed or even locked compartments. *Id.* (emphasis added). Of course, the deputies had access to the car's exterior where the plastic bag was located. And since the Sheriff's Office policy aims to prevent theft or loss of property, the deputies would have focused on identifying and safeguarding personal items, like Clayton's bag. So even if Keppen hadn't discovered Clayton's gun at the scene, one of the deputies would have eventually inventoried Clayton's plastic bag. Bottom line: Once the deputies decided to tow Clayton's car, discovery of the gun became inevitable.

Clayton responds that "[l]aw enforcement didn't have legal possession of the [car]" at the time of the inventory search. Appellant's Br. at 20. He provides three reasons for this conclusion. First, Clayton claims that he reluctantly agreed to allow police to tow his car only because "the gun was already found." *Id.* at 19. Second, he asserts that Detective Dodson manipulated him into allowing police to tow the car, making his consent involuntary. Third, he contends that the deputies didn't follow the Sheriff's Office towing procedure perfectly, making the search either invalid or not inevitable. None of his arguments is persuasive.

Clayton first suggests that the inventory search wasn't inevitable. As he explains, he allowed the deputies to tow his car—and thus inventory the plastic bag—only because he believed they had already found the gun. But Clayton's conversation with Detective Dodson suggests otherwise. Though Clayton hesitated at times, he repeatedly said that he would prefer towing the vehicle to leaving it with his sister. Dodson then assured Clayton that the deputies "ha[dn't] touched anything" in the car. R. 31, Ex. 3, 01:01–01:02. In response, Clayton asked Dodson, "Did they find the gun and a clip?" *Id*. at 01:10–01:11. Dodson cut him off before he could incriminate himself. Without getting a firm answer, Clayton again confirmed that he wanted the deputies to

tow his car. Based on this interaction, the primary factor in Clayton's decision seemed to be his relationship with his sister, not the discovery of the gun. Indeed, when Clayton consented to the tow, he didn't know whether the deputies had discovered the gun. If Clayton trusted Dodson's statements, he likely believed that the deputies *hadn't* searched the items in his car. All told, the timing of the deputies' discovery of the gun didn't change the inevitability of the inventory search.

Clayton's argument that Dodson pressured him into consenting to the tow is equally unpersuasive. Dodson patiently waited while Clayton made up his mind, offering him the option to leave the car with his sister several times. Clayton ultimately declined to do so because he thought she had "been trying to kill [him]"—not because Dodson deceived, pressured, or misled him. *Id.* at 00:36–00:37. When Clayton expressed concern about his personal items, Dodson reassured him that the deputies would photograph the items before moving them. And after Clayton seemed poised to reveal information about the crime, Dodson quickly stepped in to remind him that he was "saying things" to law enforcement. *Id.* at 01:13. It's hard to interpret their conversation as anything other than professional and polite—certainly not coercive, as Clayton now claims.

Finally, Clayton asserts that Deputy Phillips's failure to itemize Clayton's personal belongings on the tow form invalidated the inventory search. But inevitable discovery doesn't depend on perfect paperwork. The Supreme Court has upheld "slipshod" inventory searches where the officers failed to list an arrestee's personal items, including cash and valuables. *Bertine*, 479 U.S. at 369–70. Applying this guidance, our court has already found that an officer's failure to document some items recovered during an inventory search doesn't invalidate the search. *Hockenberry*, 730 F.3d at 660–61. And every circuit to have considered the question has similarly found that deficient paperwork doesn't invalidate an otherwise lawful search performed in good

faith.[2]  Here, after the deputies decided to tow Clayton's car, Phillips didn't fill out a single line on the tow form for "Vehicle Inventory."  That empty line doesn't change the fact that the deputies decided to tow the car and thus would have inventoried any items they could access.  So the tow form doesn't alter the inevitability of the gun's discovery.

Because the deputies would have inevitably discovered the gun, the district court correctly declined to exclude it.

*     *     *

We affirm.

---

[2] *See United States v. Trullo*, 790 F.2d 205, 206 (1st Cir. 1986) ("We will not hold that the officer's failure, technically, to follow the inventory form procedures for valuables meant it was not an inventory search."); *United States v. Mundy*, 621 F.3d 283, 293 (3d Cir. 2010) ("Although compliance with procedures tends to ensure the intrusion is limited to carrying out the government's caretaking function, failure to follow through with standard procedures does not necessarily render the search unreasonable." (citation modified)); *United States v. Richardson*, 229 F.3d 1145 (4th Cir. 2000) (per curiam) (unpublished table decision) ("[T]he failure to complete an inventory list does not render suspect either the motive for conducting the search or the reasonableness thereof."); *United States v. Loaiza-Marin*, 832 F.2d 867, 869 (5th Cir. 1987) ("[T]he agent's failure to complete the inventory forms does not mean that the search was not [a valid] inventory search."); *United States v. Cartwright*, 630 F.3d 610, 616 (7th Cir. 2010) ("[M]inor deviations from department policy do not render an inventory search unreasonable."); *United States v. Mayfield*, 161 F.3d 1143, 1145 (8th Cir. 1998) ("[F]ailure of police to complete inventory of arrestee's belongings as policy provided . . . did not render inventory search unreasonable."); *United States v. Magdirila*, 962 F.3d 1152, 1157 (9th Cir. 2020) ("[M]inor noncompliance with department policies does not invalidate an otherwise lawful inventory search."); *United States v. Ulibarri*, 149 F.4th 1193, 1201 (10th Cir. 2025) ("[T]he missing pieces of the tow-in report are not dispositive here."); *United States v. Westerman*, 418 F. App'x 822, 823 (11th Cir. 2011) ("An officer's failure to complete a written inventory form does not necessarily invalidate an inventory search." (citing *United States v. O'Bryant*, 775 F.2d 1528, 1534 (11th Cir. 1985))).